399 S.E.2d 834

**STATE of West Virginia**

v.

**Paul William FERRELL.**

**No. 19401.**

Supreme Court of Appeals of West Virginia.

Decided July 24, 1990.

Rehearing Denied Nov. 8, 1990.

Dissenting Opinion of Justice MILLER Dec. 19, 1990.

Daniel R. James, Barr & James, Keyser, for Paul W. Ferrell.

Roger W. Tompkins, Atty. Gen., Richard M. Riffe, Sr. Asst. Atty. Gen., Atty. Gen.'s Office, Charleston, Dennis V. DiBenedetto, Pros. Atty., Petersburg, for State of W.Va.

NEELY, Chief Justice:

Paul William Ferrell appeals his conviction before a jury of kidnapping, second degree murder and third degree arson.[1] The appellant assigns myriad errors, many of which are so obviously without merit that we find that they are not fairly raised.[2] There are, however, four major assignments in this complex and difficult circumstantial evidence case that warrant extensive discussion.

On the morning of Wednesday, 17 February 1988, the victim, Catherine Ford, a resident of Maryland, received a call from a man claiming to be a magistrate at Mt. Storm, in Grant County, West Virginia. The man wanted Ms. Ford to meet him at his office at 3:00 p.m. the same day, to discuss some checks. Later that day, a man claiming to be an undercover officer called Ms. Ford with information concerning a possible investigation of her family's restaurant by the liquor licensing authorities. Ms. Ford told her family and the restaurant employees to check identifications before selling beer, and then left the restaurant to meet with the alleged undercover officer. Ms. Ford drove her Ford Bronco on route 50 into Grant County, and turned off at the Bismark Road. She has not been seen since.

The prosecution contends that the defendant, Paul Ferrell, used fraud to entice Ms. Ford into Grant County, West Virginia for the purpose of gaining a sexual concession or other advantage from her, and that Mr. Ferrell subsequently murdered Ms. Ford and disposed of her body, burning her vehicle to cover up the crime.

On the same day that Ms. Ford disappeared, two other women received telephone calls from a man purporting to be a magistrate. This man, however, was not a real magistrate; at the time, both magistrates in Grant County, West Virginia, were females and nearby Maryland does not have magistrates.

A Grant County magistrate is usually on duty at a satellite office in the Mt. Storm

---

**1.** The appellant was sentenced to life imprisonment with mercy for kidnapping, five to eighteen years for second degree murder and one to three years for third degree arson. All sentences were to run consecutively.

**2.** We dismiss the following assignments of error as not fairly raised:

(IV.) The trial court erred in failing to dismiss the kidnapping count against petitioner upon petitioner's motion for a directed verdict at the completion of the State's case and at the completion of the defendant's case in chief because defendant should have been charged with abduction and not kidnapping.

(V.) The trial court erred in permitting F.B.I. agent William Scobie to testify without proper qualifications and an adequate foundation that based upon the blood found at the alleged crime scene that a violent act had to have occurred.

(VII.) The trial court erred in admitting the testimony of forensic serologist Audrey Lynch who testified that the blood found was *not inconsistent* with blood that would come from the offspring of the parents of the alleged victim. (emphasis added)

(VIII.) The trial court erred in refusing to grant a new trial due to juror bias extrinsic to the deliberative process

(IX.) The trial court erred in admitting into evidence forensic evidence from the "crime scene" which was not properly preserved thus constituting a denial of due process.

(X.) The trial court failed to suppress the defendant's statement in violation of the defendant's fifth amendment right to remain silent.

(XI.) The trial court failed to suppress the statement taken from the petitioner as it was not voluntarily given.

(XII.) The trial court erred in admitting into evidence hearsay testimony as to what the alleged victim said prior to her departure from her family owned restaurant.

(XIII.) There was insufficient evidence of malice being an essential element of second degree murder, and therefore, the verdict must be set aside.

(XV.) The trial court erred in not properly advising the petitioner in accordance with the *Neuman* instructions.

(XVI.) The circuit court erred in admitting a photograph of Paul Ferrell's automobile inasmuch as Kim Nelson, the State's witness and the person who identified the car, was shown an impressibly [sic] suggestive photograph identification.

(XVII.) The trial court erred by failing to conduct a proper *Bamjoman* [sic] hearing.

(XVIII.) The trial court erred by allowing various witnesses to express the opinion that Cathy Ford is dead.

(XIX.) The trial court's sequestration order was violated which should have resulted in a mistrial.

(XX.) There was insufficient evidence of arson and homicide, therefore, the verdict must be set aside.

Fire Hall on Wednesdays. Sometime between 10:30 and 11:00 on Wednesday, 17 February 1988 (the day the victim disappeared), the magistrate and her assistant observed Mr. Ferrell using the public pay phone outside of the office. The magistrate told her assistant that the man talking on the phone outside was their new deputy sheriff. Paul Ferrell had recently begun working as a deputy sheriff for Grant County. Mr. Ferrell then went into the truck bay area of the fire hall, where a phone available to the public was located, remained there a while and then left.

At 10:50 a.m. the same day, Robin Tichnell received a call from a man claiming to be a West Virginia magistrate. The alleged magistrate said that he was conducting an investigation of someone she knew, and needed to question her at the Mt. Storm Fire Hall sometime between 10:00 and 3:00. When she asked who or what the investigation concerned, he would not tell her. Consequently, she refused to leave work to meet him, and he responded that he would have to get in touch with her at a later date.

Another woman who received a strange invitation that same day was Rose Bosley, a part-time postmistress in Gormania who usually worked on Saturdays. The new post office had opened two days before, and did not yet have phone service, so Juanita Bosley, the regular postmistress asked the younger woman to fill in for her while she made telephone calls to various utility companies. While the young woman was filling in, a man telephoned Viola Knotts, an elderly woman who lived across the street from the post office, and asked her to tell Rose Bosley to come and get her mail carrier whose car had broken down between Bismark and Cherry Ridge Road. The Gormania route, however, would not take the carrier to those roads.

From the room in Mr. Ferrell's family store in which his telephone was located, Mr. Ferrell could see people come and go from the post office, and could also see Ms. Knotts' residence. Mr. Ferrell's store was also within sight of the restaurant where Cathy Ford worked.

Kim Nelson lived in the trailer nearest Mr. Ferrell's trailer on the same driveway off of the Bismark Road, but did not know Paul Ferrell. She testified that between 1:00 and 2:00 p.m. on 17 February 1988, banging and terrified screams emanated from Mr. Ferrell's trailer for about a minute, followed by a gunshot from the same trailer. A man then drove out in a light blue car. In court Ms. Nelson identified from a photograph that it was Paul Ferrell's car that she had observed departing. The man drove back one-half hour later, and drove out again later in the afternoon, at which time Ms. Nelson saw a side-view of the driver. On 18 February 1988, Ms. Nelson saw the same man burning something out in back of Paul Ferrell's rented trailer. Ms. Nelson first learned the man's name when she recognized Paul Ferrell's picture in the newspaper after his arrest.

On 18 February 1988, Mr. Ferrell ripped out and burned the carpeting from the master bedroom of his trailer (mobile home), replacing it with new carpeting on the following day. Mr. Ferrell claimed that he did this because of dark stains and dead animal odor. However, when his girlfriend, Cathy Bernard, visited his trailer on 14 February 1988, she had not noticed any stains on the master bedroom carpet, nor any strong odors. Also Mr. Ferrell's landlord had not noticed any stain or odors in the trailer on 21 January 1988.

Paul Ferrell demonstrated concern about the disappearance of Cathy Ford. On 20 February 1988, when his girlfriend, Cathy Bernard, asked him if he had heard about Cathy Ford's disappearance, Paul Ferrell said that he had heard about it, that he knew who Ms. Ford was, and that he was afraid that people might suspect him or his brother of involvement in her disappearance. He was afraid because Ms. Ford was last seen heading in the direction of Mt. Storm, where defendant's trailer was located.

On Sunday, 21 February 1988, Ms. Bernard, before washing Paul Ferrell's clothes, found in a pocket a note that dealt with two people posing as a young couple and setting someone up by using a fake

identification card. When Ms. Bernard asked Paul Ferrell about the note later, he seemed concerned, and explained that someone from the liquor board was going around to various places in the area trying to get them to sell liquor to minors, and that the note had something to do with that.[3]

Paul Ferrell manifested an obsession with Cathy Ford's disappearance. Perhaps in an attempt to explain why he was obsessed, he told Ms. Bernard that he knew Cathy Ford well, and that they had been intimate about a year before he met Ms. Bernard. However, David Ferrell, defendant's brother, told Ms. Bernard that he knew nothing about that, and that if Paul had had an affair with Ms. Ford, he would have known something.

On the evening of Friday, 26 February 1988, Paul Ferrell and two other officers met with a private citizen, Vonda Moreland, who wanted advice on organizing a search for Cathy Ford. About an hour and a half after the meeting, Paul Ferrell called Ms. Moreland and asked her if she could call off the search, at least for 48 hours, because the officers had found some solid evidence. Ms. Moreland was unable to reach enough people to call off the search, and when Paul Ferrell called back later in the evening to ask if she had been able to call off the search, she told Mr. Ferrell that she had not been able to do so. Paul Ferrell then told Ms. Moreland, regarding the search scheduled for the following day, to search any place except the Bismark and the Cherry Ridge Roads. When asked why they should not search those roads, Paul Ferrell explained that the evidence was on those roads. Mr. Ferrell was not lying when he said the evidence was on those roads. The Ford Bronco that Ms. Ford was last seen driving was found right along the Stony River off of the Bismark Road. Directly across the river from the Bronco, and running parallel to the Bismark Road, ran the Cherry Ridge Road. Paul Ferrell could reach the spot where the Bronco was burned without going to a main road. His driveway led to a seldom travelled road that led to the site of the burned Bronco. The jury could logically have inferred that Mr. Ferrell discouraged a search of this area because he did not want the searchers to find Cathy Ford's Bronco.

On 29 February 1988, Mr. Ferrell made a collect call from Uniontown, Pennsylvania to his girlfriend, Cathy Bernard, in which he asked her to call the Ford family to say Cathy Ford was alright. When asked to explain Ms. Bernard's testimony that he had asked her to make calls claiming she was Cathy Ford, Paul Ferrell told police that on 20 February 1988, (three days after Cathy Ford disappeared), he asked Ms. Bernard to call someone saying Cathy Ford was alright, because he wanted to slow down the investigation so that his telephone calls might not be discovered. On 2 March 1988, Cathy Ford's parents received a letter postmarked Pittsburgh, 29 February 1988. (It was stipulated that a letter mailed from Uniontown would be postmarked Pittsburgh.) The letter said:

> The only crime here was we had to get rid of the old man's Bronco right away. Cathy is 19, an adult and we had to leave fast. We came into some dangerous money. So here is some money on the Bronco. More will follow. She will call you when she feels it is safe to do so. We are heading where I can get some work. Cathy made me write so you would not worry. She had to get away from Moon, the restaurant and certain people. We keep the money, her green bank bag. Tell Moon to leave us alone.

Richard Williams, an FBI handwriting expert, testified that the letter and its envelope were both in Paul Ferrell's handwriting. Enclosed with the letter was the sum of two hundred dollars in twenty dollar bills. On 23 February 1988, Paul Ferrell had withdrawn two hundred dollars from his personal savings account.

---

**3.** The testimony was unclear on the exact contents of the letter and of the subsequent conversation between Cathy Bernard and Paul Ferrell. Cathy Bernard's testimony on this matter was offered to link Paul Ferrell to the telephone call to Cathy Ford concerning a liquor investigation of her family's restaurant.

On 8 March 1988, the Ford Bronco in which Cathy Ford was last seen was found burned and hidden in brush near the river, off the Bismark Road. The people who found the Bronco knew to look there because they heard that smoke was seen hanging over the river on 17 February 1988. Experts determined that the fire was deliberate arson.

On 11 March 1988, the police questioned Paul Ferrell, and after obtaining his written permission, searched his trailer. Soon after the search, they found out that Mr. Ferrell had replaced the carpeting in the bedroom. The police obtained a search warrant, and on 19 March a police search of Mr. Ferrell's mobile home revealed tiny splatters of blood in various places on walls, mirrors, and the ceiling of the bedroom. Blood had also dripped through the crack between two sections of plyboard to a floor joist underneath. Blood was also found on a piece of material in a waste basket. The FBI was able to identify some of the blood as human, and the blood type was not inconsistent with blood of a child of the victim's parents. Also, a cigarette butt of the type smoked by Ms. Ford was found. The cigarette was smoked by someone with a blood type also not inconsistent with Ms. Ford's parents.

On 20 March 1988, Paul Ferrell was arrested. On 25 March 1988, police found a wristwatch of the type given to Ms. Ford by her father, near a small burn area behind Mr. Ferrell's mobile home.

After Cathy Ford's disappearance, it came out that several other young women in the area of Grant County, West Virginia, and Garrett County, Maryland also received phone calls directing them to secluded areas. There were two sets of phone calls, the first set made between 28 September 1987 and late November 1987, and the second set between 1 February 1988 and 17 February 1988.

From 14 September 1987 to 27 November 1987, Paul Ferrell rented a mobile home on the Bayard–Wilson–Corona Road. Between 28 September 1987 and late November 1987, several women in Grant County, West Virginia and nearby Garrett County, Maryland received unusual phone calls from a man who directed them to various locations near Paul Ferrell's trailer on the Bayard–Wilson–Corona Road, including the trailer itself and a garage building near the trailer. The caller posed as various people, including a doctor, a magistrate, a police officer, and a passing motorist. All of the recipients were attractive women between the ages of nineteen and thirty-nine.

A young woman who testified that it was Mr. Ferrell who had called her, said that he had asked for her sister's phone number at work. Her sister's phone number was later found written on the cover of a phone book in the living quarters of Mr. Ferrell and his brother, above Ferrell's Mart in Gormania, West Virginia. The telephone there was a private one listed in the name of the defendant, and he used this phone to make many of his unusual calls.

On 21 January 1988, Paul Ferrell rented a mobile home off of the Bismark Road. From 1 February 1988 to 17 February 1988, several young women in the area received strange calls in which a man purporting to be someone other than Paul Ferrell directed them to the area near Mr. Ferrell's trailer along the Bismark Road. The calls were similar to those made earlier in which a man had directed young women to the Bayard–Wilson–Corona Road.

Paul Ferrell made a regular practice of posing as someone else while calling people on the phone to get them to do his bidding. Paul Ferrell made numerous phone calls to bookstores and libraries across the country, in which he posed as a doctor seeking information on anal sex and anal stimulation. He often tried to get a female employee to read to him from pages 177 and 178 of *The New Our Bodies, Ourselves*.[4] Some employees read some of it to him, and others would not. One employee testified that she heard heavier breathing as the conversation went on, and said "[i]t was like the

**4.** The Boston Women's Health Book Collective Staff. *The New Our Bodies, Ourselves,* Simon and Schuster (New York, 1985).

anticipation of hearing." Another person whom the "doctor" called testified that the caller noticed when the employee missed a paragraph on page 177, and asked if she would go back and read it. When police asked Mr. Ferrell about the calls, he told them that he had made such calls from his girlfriend's residence and from the living quarters above Ferrell's Mart. He also said that he frequently posed as a doctor during these calls because he found it was very easy to get the information he wanted that way.

## I.

■ Mr. Ferrell contends that evidence of over 206 phone calls to various bookstores and libraries across the country should have been excluded, because it was more prejudicial than probative. The State contends that the evidence of the phone calls was probative because it established motive, intent, and common plan or scheme, and that the evidence was essential to prove the charge of kidnapping.

■ This Court, in *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974), recognized that relevant evidence of prior crimes or wrongs is admissible to establish motive, intent, absence of mistake or accident, identity, or existence of a common scheme or plan. The *West Virginia Rules of Evidence* now provide in Rule 404(b):

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Rule 404(b) states essentially the same rule that we pronounced in *Thomas, supra.* When adopted, it was identical to *FRE* 404(b). *FRE* 404(b) has since been amended so that it is gender neutral, but no substantive changes were intended.

There have been a number of federal cases in which evidence of other bad acts has been admitted under *FRE* 404(b). *U.S.*

*v. Kerr*, 778 F.2d 690 (11th Cir.1985), was a prosecution for mail fraud and conspiracy to commit mail fraud, based on the predicate crime of arson of a pharmacy. Evidence of irregularities in the dispensing of drugs was held admissible to prove motive and intent to commit arson, even though it raised a prejudicial implication of drug trafficking. *See also, U.S. v. Merryman*, 630 F.2d 780 (10th Cir.1980) (evidence of other bad acts was admissible to rebut defendant's claim of mistake or lack of knowledge or intent); *U.S. v. Thomas*, 632 F.2d 837 (10th Cir.1980) (evidence that one defendant made a death threat growing out of a theft of narcotics was admissible to prove that he was a leader of the drug conspiracy).

As in the cases cited above, the State did not offer the phone call evidence to show that defendant was more likely to commit the crime of kidnapping. In fact, the phone calls do not show that defendant's character made him more likely to kidnap someone. The calls simply prove elements essential to the kidnapping case, namely motive and intent, and also tend to show a common plan or scheme. The record shows that Paul Ferrell made numerous phone calls to bookstores and libraries, and that he regularly received sexual gratification from interaction with persons who were not voluntary providers of sexual gratification. These calls, when considered in conjunction with the calls to local women, are probative, because they tend to prove that Mr. Ferrell used fraud to entice Cathy Ford to the area of his mobile home for the purpose of obtaining some sexual concession or advantage. We therefore agree with the circuit court that the evidence is more probative than prejudicial; it tends to prove that Paul Ferrell enticed Ms. Ford to the area near his mobile home for the purpose of obtaining some concession or advantage from her.

■ In *State v. Sette*, 161 W.Va. 384, 242 S.E.2d 464 (1978), a case involving the murder of a woman by her husband and his mistress, the prosecution presented evidence that as part of an extramarital relationship, the defendant husband and his

mistress had engaged in oral sex at a time when to do so was a felony. This Court held that because there was ample evidence of the sexual relationship, the evidence concerning oral sex had no probative value whatsoever on the issue of whether defendant had plotted with his mistress to murder his wife. *Id.*, 161 W.Va. at 394, 242 S.E.2d at 471. However, this Court went on to say that, "if the state had been able to demonstrate that this had any reasonable bearing upon the intensity of the emotional relationship and, therefore, upon the strength of the motive, it would have been admissible testimony." *Id.*, 161 W.Va. at 395, 242 S.E.2d at 471. But in *Sette* the State had not attempted to make the connection, so the Court concluded that the evidence was introduced "exclusively for its prejudicial effect." *Id.*[5]

■ Although the phone call evidence was prejudicial to the murder and arson charges, it was admissible in the State's effort to prove the kidnapping charge. In light of the overwhelming evidence on the murder and arson charges we find no reversible error.

■ Mr. Ferrell also assigns as error the lack of a "meaningful" *in camera* hearing before evidence of the phone calls was admitted. An *in camera* hearing on evidence such as the phone calls involved here is required by *State v. Dolin*, 176 W.Va. 688, 347 S.E.2d 208 (1986). However, the record shows that there was an *in camera* hearing on the phone calls to bookstores and libraries. We note that this Court in *Dolin* also gave the defendant the right to request and receive a limiting instruction on evidence such as the phone calls involved here. However, Mr. Ferrell did not request such a limiting instruction, perhaps for reasons of trial tactics and strategy, so there was no error in the court's not giving one.

II.

■ Mr. Ferrell claims that there was insufficient evidence to convict him of kidnapping. After careful examination of the record, however, we conclude that his conviction for kidnapping should be upheld. The defendant was charged and convicted under *W.Va.Code*, 61-2-14a [1965], the general kidnapping statute.[6]

5. The defendant inconsistently numbers his assignments of error throughout his brief. He sometimes joins with his challenge to the admissibility of the phone calls on anal sex, a contention that excerpts from the book *The New Our Bodies, Ourselves, supra*, should not have been admitted for the jury to read. We find there to be no reversible error in the trial court's exercise of discretion regarding the book. To understand the significance of the phone calls, the jury would have had to know something about the subject of the calls. If the jury were told only that the defendant had material concerning anal sex read to him, the imaginations of the jurors might roam to envisage texts far more scandalous than the relatively clinical text involved here. Perhaps it would have been better to allow the excerpts to be read to the jury without admitting the text as an exhibit. However, we cannot conclude that the defendant was prejudiced by the trial court's decision on that point.

6. § 61-2-14a provides:
 If any person, by force, threat, duress, fraud or enticement take, confine, conceal, or decoy, inveigle or entice away, or transport into or out of this State or within this State, or otherwise kidnap any other person, for the purpose or with the intent of taking, receiving, demanding or extorting from such person, or from any other person or persons, any ransom, money or other thing, or any concession or advantage of any sort, or for the purpose or with the intent of shielding or protecting himself or others from bodily harm or of evading capture or arrest after he or they have committed a crime, he shall be guilty of a felony, and, upon conviction, shall be punished by confinement in the penitentiary for life, and he, notwithstanding the provisions of article twelve [§ 62-12-1 et seq.], chapter sixty-two of this Code, shall not be eligible for parole: provided, That the jury may, in their discretion, recommend mercy, and if such recommendation is added to their verdict, such person shall be eligible for parole in accordance with the provisions of said article twelve: Provided, however, That if the accused pleads guilty, the court may, in its discretion, provide that such person shall be eligible for parole in accordance with the provisions of said article twelve, and, if the court so provides, such person shall be eligible for parole in accordance with the provisions of said article twelve in the same manner and with like effect as if such person had been found guilty by the verdict of a jury and the jury had recommended mercy: Provided further the person against whom the offense is committed is returned, or is permitted to return, alive, without bodily harm having been

■ Once a jury convicts a defendant, he bears a heavy burden on appeal. This Court set out the standard in Syllabus point 1 of *State v. Starkey*, 161 W.Va. 517, 244 S.E.2d 219 (1978), where we said:

In a criminal case, a verdict of guilt will not be set aside on the ground that it is contrary to the evidence, where the state's evidence is sufficient to convince impartial minds of the guilt of the defendant beyond a reasonable doubt. The evidence is to be viewed in the light most favorable to the prosecution. To warrant interference with a verdict of guilt on the ground of insufficiency of evidence, the court must be convinced that the evidence was manifestly inadequate and that consequent injustice has been done.

Thus, it is with this standard in mind that we must consider defendant's assignment of error.

The prosecution needed to prove beyond a reasonable doubt that Mr. Ferrell used fraud to entice Ms. Ford to the area near his mobile home, for the purpose of gaining a "concession or advantage" in the form of sexual gratification. If, therefore, there was sufficient evidence from which the jury *could* find beyond a reasonable doubt that the defendant used fraud to entice Ms. Ford to his mobile home with the intent of gaining a concession or advantage from her, then his conviction must be affirmed.

■ Mr. Ferrell claims that the prosecution failed to show that he used force on the victim, transported the victim, or confined her. However, in *State v. Hanna*, 180 W.Va. 598, 378 S.E.2d 640 (1989), which also involved the kidnapping and disappearance of a young woman, this Court said, "[i]t is clear that kidnapping can be accom-

plished under our statute without force or compulsion since it uses terms such as 'fraud', 'decoy', 'inveigle' or 'entice away' ". *Id.*, 180 W.Va. at 604, 378 S.E.2d at 646 n. 7. Just as the general kidnapping statute, *W.Va. Code*, 61-2-14a [1965], does not require force, neither does it require transportation or confinement of the victim.[7]

On the element of fraud, the jury had ample evidence of Mr. Ferrell's use of fraudulent phone calls to obtain what he desired, so that they could reasonably infer that Mr. Ferrell used fraud to get Cathy Ford to meet him at or near his trailer. On the element of enticement, the jury's determination from the overwhelming evidence that Cathy Ford was killed in Paul Ferrell's mobile home, combined with the phone call to Cathy Ford concerning the liquor investigation, could lead the jury reasonably to believe that Paul Ferrell told Cathy Ford something to get her to meet with him, and that she actually went to his trailer because of his fraudulent representations.

Evidence of Mr. Ferrell's motive for luring Cathy Ford to his trailer comes from the telephone calls he made to bookstores and libraries for sexual gratification. Mr. Ferrell had the same motive in calling young women, including the victim, and enticing them to secluded areas near his trailer. The record presents a picture of Mr. Ferrell as a man who regularly obtained sexual gratification from involuntary partners; in other words, the prosecution proved system, motive and intent.

■ Mr. Ferrell also argues that he cannot be convicted of kidnapping if he is convicted of murder, because the kidnapping would be only incidental to the murder. In *State v. Miller*, 175 W.Va. 616, 336 S.E.2d 910 (1985), this Court held that one

inflicted upon him, but after ransom, money or other thing, or any concession or advantage of any sort has been paid or yielded, the punishment shall be confinement in the penitentiary for any term of years not less than twenty: And provided further, That in all cases where the person against whom the offense is committed is returned, or is permitted to return, alive, without bodily harm having been inflicted upon him, but without ransom, money or other thing, or any concession

or advantage of any sort having been paid or yielded, the punishment shall be confinement in the penitentiary for any term of years not less than ten.

7. In *State v. Weaver*, 181 W.Va. 274, 382 S.E.2d 327 (1989), this court noted that "kidnapping was so broadly defined, virtually any movement or detention of a person during the commission of another crime fell within the kidnapping statute." *Id.*, 181 W.Va. at 278, 382 S.E.2d at 331.

limit that must be placed on the broad scope of the kidnapping statute is that, "a kidnapping has not been committed when it is incidental to another crime." Syllabus point 2, *Id.* The court then laid out the test, "[i]n deciding whether the acts that technically constitute kidnapping were incidental to another crime, courts examine the length of time the victim was held or moved, the distance the victim was forced to move, the location and environment of the place the victim was detained, and the exposure of the victim to an increased risk of harm." *Id.* In *Miller*, the facts showed that the defendant forced the victim to travel a not inconsequential distance, confined her behind a locked gate for a substantial period under threat of physical harm, before committing the separate offense of sexual assault. *Id.*, 175 W.Va. at 622, 336 S.E.2d at 916.

There are situations where an offense that would technically constitute kidnapping under our broadly worded statute cannot be considered a separate offense. For example, where prisoners briefly confined prison guards in the course of an escape, and did not use any guards as hostages or shields, this Court held that the kidnapping was incidental to the escape. *State v. Brumfield*, 178 W.Va. 240, 358 S.E.2d 801 (1987).

In the case before us, however, it is highly unlikely that Paul Ferrell enticed Cathy Ford to his trailer exclusively in order to kill her; rather the jury could have reasonably believed that he enticed her to his trailer in order to commit the offense of rape, an offense with which he was not charged. Therefore, we find no reason that defendant cannot be convicted of the separate offenses of kidnapping and murder.

### III.

 Mr. Ferrell argues that the testimony of Special Agent Curtis concerning Mr. Ferrell's body movement during a polygraph test should not have been admitted at trial. Agent Curtis was testifying as an expert witness with regard to responses he observed before and after, but *not during*, a polygraph test that he administered to Mr. Ferrell.[8] As part of the interview, Agent Curtis presented the defendant with a scenario in which there were two Paul Ferrells, one that was a calm, rational individual, and another who acted emotionally, and struck out in anger at Cathy Ford. Agent Curtis testified that as he was verbally presenting the scenario, Mr. Ferrell was nodding. However, Agent Curtis went further than simply stating that Mr. Ferrell nodded, and opined that, based upon his expertise in interpreting body language, Mr. Ferrell's nodding was an admission of guilt.

We agree with defendant that it was improper for Agent Curtis to give expert testimony to the effect that Mr. Ferrell admitted guilt by nodding while Agent Curtis was speaking to him. It is entirely possible that Mr. Ferrell was simply nodding to show that he was listening, and in no way agreed with what Agent Curtis was telling him. Indeed, this point was strenuously pointed out by defense counsel in cross-examination. The jury is competent to determine the meaning of such everyday non-verbal communication, and Agent Curtis should not have been allowed to add an expert opinion. However, this was but a small part of a very long and complicated trial; although the court gave no cautionary instruction, the extensive cross-examination by defense counsel adequately pointed out to the jury the inconclusiveness of nodding during conversation.

 This court will not reverse a conviction for harmless error. A concisely worded test of whether error is harmless was announced by this Court in *State v. Davis*, 153 W.Va. 742, 172 S.E.2d 569 (1970):

A verdict of guilty in a criminal case will not be reversed by this Court because of error committed by the trial court, unless the error is prejudicial to the accused.

We set out a more detailed test in Syllabus point 2, *State v. Atkins*, 163 W.Va. 502, 261

---

**8.** The trial court was careful to prevent any testimony regarding the polygraph test itself.

S.E.2d 55 (1979), *cert. denied,* 445 U.S. 904, 100 S.Ct. 1081, 63 L.Ed.2d 320 (1980).

Where improper evidence of a nonconstitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury.

*See also State v. Banjoman,* 178 W.Va. 311, 359 S.E.2d 331 (1987); *State v. Thompson,* 176 W.Va. 300, 342 S.E.2d 268 (1986); *State v. Tanner,* 171 W.Va. 529, 301 S.E.2d 160 (1982); *State v. Church,* 168 W.Va. 408, 284 S.E.2d 897 (1981); *State v. Haverty,* 165 W.Va. 164, 267 S.E.2d 727 (1980).

Removing from the State's case Agent Curtis' opinion on the meaning of Mr. Ferrell's nodding, the remaining evidence is clearly sufficient to convince impartial minds of Mr. Ferrell's guilt beyond a reasonable doubt. Mr. Ferrell discouraged a search of the area when Ms. Ford's Bronco was located; he wrote a letter to Ms. Ford's parents; he asked his girlfriend to make calls to indicate to Ms. Ford's family that she was all right; and he regularly used telephone impersonations to attempt to entice young women to meet him in secluded areas. Thus we conclude that Agent Curtis' opinion on the nodding, particularly when taken in the context of defense counsel's skillful cross-examination, had no prejudicial effect on the jury and the error committed was harmless.

## IV.

■ Defendant contends that the trial court erred by instructing the jury that they were to determine the "guilt or innocence of the accused." Upon an examina-tion of the context in which the phrase "guilt or innocence of the accused" was used, and considering the purpose of the instruction in which that phrase is to be found, we find that there was no error.

After giving specific instructions that went on for twenty-three pages of trial transcript, the court began to give its "standard" or "general" charge to the jury. At the beginning of the general charge, the court cautioned the jury that they were not there to judge the defendant for crimes that were not charged in that proceeding. The court said:

I caution you members of the jury that you are here to determine the guilt or innocence of the accused from the evidence in this case. The defendant is not on trial for any act, or conduct, or offense not alleged in the indictment. Neither are you called upon to return a verdict as to the guilt or innocence of any person or persons not on trial.

The point the court was making benefited the defendant, but making the point concisely without using the word "innocence" to contrast with the word "guilt" would have been difficult linguistically without involved convolutions distinguishing "guilty" from alternatives like "failure to prove guilt beyond a reasonable doubt," etc.

The court had already correctly instructed the jury that it could choose between two verdicts, "guilty" and "not guilty" so that the distinction was clear. The court had also instructed the jury that the State must overcome the presumption of innocence by proof beyond a reasonable doubt, so the standard of proof was clear.

■ In Syllabus point 3 of *State v. Starkey, supra,* this Court said:

An instruction in a criminal case which is not binding and does not require the jury to accept a presumption as proof beyond a reasonable doubt of any essential element of a crime, or require the defendant to introduce evidence to disprove an essential element of the crime for which he is charged, is not erroneous.

Like the instruction in that case, the instruction to which Paul Ferrell objects does not change the burden of proof. In short, both instructions do not misstate the law in any way that hurts the defendant.

In *Smith v. Bordenkircher*, 718 F.2d 1273 (4th Cir.1983), *cert. denied*, 466 U.S. 976, 104 S.Ct. 2355, 80 L.Ed.2d 828 (1984), the Fourth Circuit addressed a similar problem, in a case involving a West Virginia prisoner. The trial judge gave an instruction equating "good and substantial doubt" with "reasonable doubt." The court said that "each challenged instruction of this general sort must be assessed in its particular context to determine whether by itself it so infected the trial that due process was denied." *Id.*, at 1277. The court found that the challenged expressions were more accurate when viewed in context than when viewed in "artificial isolation," and were not likely to "mislead the jury into finding no reasonable doubt when there was some." *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 138, 99 L.Ed. 150 (1954).

In *Stinnett v. U.S.*, 173 F.2d 129 (4th Cir.1949), *cert. denied*, 337 U.S. 957, 69 S.Ct. 1531, 93 L.Ed. 1756 (1949), the Fourth Circuit addressed a case where the defendant isolated one sentence from the judge's charge to the jury. The appeals court noted that the sentence to which objection was made was "not intended as a complete statement in itself of all the elements of the crime charged," and that other parts of the court's charge resolved any possible ambiguity. *Id.*, at 130. Consequently, the Fourth Circuit found there was no prejudicial error in the charge to the jury. On examining the challenged sentence of the judge's charge to the jury in the context of the specific instructions and the general charge, we find that there was no error.

 In addition, defendant did not object to the charge when given. Syllabus point 1 of *State v. Smith*, 169 W.Va. 750, 289 S.E.2d 478 (1982), this Court stated:

As a general rule, proceedings of trial courts are presumed to be regular, un-less the contrary affirmatively appears upon the record, and errors assigned for the first time in an appellate court will not be regarded in any matter of which the trial court had jurisdiction or which might have been remedied in the trial court if objected to here.

The trial court could have corrected whatever problem there might have been in the charge, if asked to do so. No objection was made at trial, so we find no reversible error in the challenged sentence.

Accordingly, for the reasons set forth above, the judgment of the Circuit Court of Grant County is affirmed.

Affirmed.

MILLER, Justice, dissenting:

### I.

I must disagree with the majority's conclusions regarding the admissibility of the evidence relating to the telephone calls to the various bookstores. I believe this evidence was not relevant to the crimes charged and was, therefore, inadmissible. Because of the highly prejudicial nature of the evidence, I believe its admission at trial was reversible error.

The State offered this evidence to prove that the kidnapping of Cathy Ford was sexually motivated. It must be remembered, however, that the State's case was based entirely on circumstantial evidence. The defendant was not seen with Cathy Ford on or near the date of her disappearance, and her body had not been found at the time of trial. There was absolutely no evidence that Cathy Ford had been sexually assaulted or abused following her disappearance.

The only evidence introduced by the State in this regard was a series of telephone calls to bookstores, placed from the defendant's telephone, in which a male caller asked the salesperson to read selected portions of a book describing anal sex practices. None of the salespersons who testified were able to identify the defendant as the caller.[1] From these meager facts, the

---

1. The defendant did admit making several calls from a different phone.

majority concludes that "[t]he record shows that Paul Ferrell made numerous phone calls to bookstores and libraries, and that he regularly received sexual gratification from interaction with persons who were not voluntary providers of sexual gratification." 184 W.Va. at 130, 399 S.E.2d at 841.

As an initial matter, I do not believe the majority's characterization of the facts is accurate.[2] Having twisted the facts, it comes as no surprise to me that the majority would then twist the law.

The majority begins by setting up a false premise, i.e., that "the State did not offer the phone call evidence to show that defendant was more likely to commit the crime of kidnapping.... The calls simply prove elements essential to the kidnapping case, namely motive and intent, and also tend to show a common plan or scheme." 184 W.Va. at 130, 399 S.E.2d at 841. This would render the evidence admissible under Rule 404(b) of the West Virginia Rules of Evidence.

I believe, however, that the evidence of the telephone calls to the bookstores does not have a sufficient connection to the victim of the alleged crime to render it admissible under Rule 404(b). There was no evidence, for example, that similar phone calls or, indeed, any type of obscene or harrassing phone calls were made to Cathy Ford or to any other women in the area. There is nothing in the record to indicate that other women in the area had been abducted for sexual purposes during the period in which the telephone calls to the bookstore were made or that the defendant had ever attempted to coerce anyone to engage in the sexual practices described in the phone calls.

My review of the law of other jurisdictions reveals no case in which evidence of

this nature, which did not clearly demonstrate some nexus to the offense charged, was admitted under the precepts of W.Va. R.Evid. 404(b). In cases involving sexual offenses, for example, evidence that the defendant made obscene or suggestive telephone calls before or after the crime has been held to be admissible to show motive or intent or to identify the defendant as the perpetrator of the offense. *E.g., Ballweg v. State*, 158 Ga.App. 576, 281 S.E.2d 319 (1981); *Blanton v. State*, 150 Ga.App. 559, 258 S.E.2d 174 (1979); *State v. Stephens*, 708 S.W.2d 345 (Mo.App.1986). In each of the above-cited cases, however, the phone calls were directed at the victim of the sexual offense.

In sum, then, I do not believe that this evidence was admissible as an exception to the general rule prohibiting the introduction of evidence of other crimes or wrongs. At most, the evidence demonstrated to the jury that the defendant had a propensity to commit the crimes charges because he is a "bad" man.[3] That is the very result the rule seeks to prevent. *E.g., State v. Hanna*, 180 W.Va. 598, 378 S.E.2d 640 (1989); *State v. Harris*, 166 W.Va. 72, 272 S.E.2d 471 (1980); *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974). This is particularly true in view of the highly prejudicial nature of such evidence. *See State v. Dolin*, 176 W.Va. 688, 347 S.E.2d 208 (1986), *overruled on other grounds, State v. Edward Charles L.*, 183 W.Va. 641, 398 S.E.2d 123 (1990). Consequently, I conclude that the trial court abused its discretion in allowing the jury to hear the evidence of the telephone calls to the bookstores.

Moreover, the real question, left unanswered by the majority, is whether this evidence, if admissible, establishes an in-

---

**2.** There was, for example, no evidence of any telephone calls made to libraries. Moreover, one can only assume that the majority's reference to "[in]voluntary providers of sexual gratification" is intended to describe the salespersons who took the telephone calls at the bookstores. In each instance, the salesperson was asked to locate and to read certain passages over the telephone. It is apparent that at any point along the way the salesperson could have

terminated these voluntary activities by hanging up or by advising the caller that it was not customary to read books over the telephone.

**3.** Indeed, in closing argument, the prosecution stated that the telephone calls demonstrated that the defendant had a "perverse or somewhat abnormal attitude" and that he was "depraved of heart and mind."

tent or motive for the kidnapping. We have recognized that proof of a motive or intent is an essential element of the crime of kidnapping. *E.g., State v. Hanna, supra. See State v. Fortner,* 182 W.Va. 345, 387 S.E.2d 812 (1989); *State v. Miller,* 175 W.Va. 616, 336 S.E.2d 910 (1985).

This case lacks even the circumstantial evidence that was present in *State v. Hanna, supra,* where the defendant's former live-in girlfriend had attempted to break off her relationship with the defendant and had begun dating another man. The defendant became enraged, broke into the man's house, and took the girl with him against her will. She was never seen again. The State charged the defendant, among other things, with abduction, an offense which requires proof of a sexual motivation. *See also State v. Miller,* 175 W.Va. at 620 n. 3, 336 S.E.2d at 914 n. 3. Despite the prior intimate relationship between the defendant and the victim, we held that there was "no evidence of any overt act or statement indicating that the defendant was sexually motivated to remove [the victim] from [the] home." 180 W.Va. at 605, 378 S.E.2d at 647.

An analogous situation arose in *State v. Walters,* 99 Or.App. 570, 783 P.2d 531 (1989), *review allowed,* 309 Or. 521, 789 P.2d 1386 (1990), in which the defendant was tried on charges of attempted kidnapping and attempted sexual assault after approaching a thirteen-year-old girl and offering her money to enter his vehicle to help him search for a lost dog. The prosecution offered evidence that the defendant had previously been convicted of the rape and sodomy of another thirteen-year-old girl whom he had approached in the same manner. In reversing the conviction for attempted sexual assault, the court stated:

"It is true that, from defendant's persistent efforts, in spite of the victim's refusal, to entice her into his truck to look for a nonexistent dog, the jury could conclude that defendant intended to interfere substantially with her liberty and to take her from one place to another.... The jury could also conclude from defendant's behavior and remarks to the victim's mother and the police officer that

he was sexually attracted to the victim. There is nothing in the record, however, to permit the jury to infer that defendant intended to injure the victim physically or to rape or sodomize her." 99 Or.App. at 575, 783 P.2d at 533–34.

Finally, in *Stevens v. Commonwealth,* 8 Va.App. 117, 379 S.E.2d 469 (1989), the defendant was convicted of murder and abduction. There was no affirmative evidence of a sexual relationship between the defendant and the victim, and the medical examiner was unable to determine if she had been sexually assaulted due to the decomposition of the body. The court found sufficient evidence to support the convictions based on several sexually suggestive remarks the defendant had previously made about the victim to third persons.

The evidence presented by the State below lacks even this minimal factual basis to prove the element of intent essential to the kidnapping conviction. As I have already remarked, there was simply no evidence to connect the telephone calls to the bookstores with the kidnapping of Cathy Ford. Consequently, because there was a lack of evidence to show that Cathy Ford was abducted for the purpose of obtaining some sexual advantage or concession, the kidnapping charge cannot, in my opinion, be sustained.

II.

The majority agrees that it was error for the prosecution to elicit from F.B.I. Agent Curtis his opinion that the defendant's body language demonstrated his guilt of the crimes charged. Typical of its well-crafted opinion, the majority offers no reason for this conclusion. Certainly, as a minimum beginning point, the majority writer might have cited his recent opinion in *State v. Woodall,* 182 W.Va. 15, 385 S.E.2d 253 (1989), where the threshold rule for the admissibility of expert testimony in such circumstances was outlined in Syllabus Point 1:

"Under *W.Va.R.Evid.,* Rule 702, expert testimony concerning generally rec-

ognized tests is presumptively admissible and the burden of excluding such testimony is upon the side seeking exclusion. However, when a test is novel or not generally accepted, that circumstance alone meets the threshold requirement of rebutting any presumption of admissibility under Rule 702 and, therefore, with regard to tests that are not generally accepted the burden of proof that the test is reliable remains on the proponent."

It is perhaps an understatement to say that body language interpretation is novel and not generally accepted as a means of proving guilt.[4] I am aware of no appellate court which has sanctioned expert opinion based on body language tests. The trial record is completely barren of any effort on the part of the State to make the threshold demonstration that the interpretation of body language has become recognized in the scientific community. Without such an initial showing, our cases are clear that the test results should not be admitted. *State v. Woodall, supra; State v. Barker*, 179 W.Va. 194, 366 S.E.2d 642 (1988); *State v. Clawson*, 165 W.Va. 588, 270 S.E.2d 659 (1980).

The majority, however, was undoubtedly not concerned with this point because it intended to conclude that the error was harmless, a result which borders on the absurd. While the majority relies on the harmless error rule set out in Syllabus Point 2 of *State v. Atkins*, 163 W.Va. 502, 261 S.E.2d 55 (1979), *cert. denied*, 445 U.S. 904, 100 S.Ct. 1081, 63 L.Ed.2d 320 (1980), it undertakes no careful analysis of the rule. In *Atkins*, we discussed at length some of the practical factors to consider in

determining whether the identified error should be deemed harmless, including the principle that where the case "is basically a circumstantial evidence case, ... there is an increased probability that the error will be deemed prejudicial." 163 W.Va. at 515, 261 S.E.2d at 63.

It must be recalled that the State's case here was entirely circumstantial. Even the majority begins its opinion by acknowledging that this is a "difficult circumstantial evidence case." 184 W.Va. at 126, 399 S.E.2d at 837. Cathy Ford's body was never found. No witness ever saw the defendant with her. Contrary to the majority's assertion, none of the women who had received telephone calls similar to those received by Cathy Ford on the day she disappeared could positively identify the defendant as the caller. Despite numerous interrogations, the defendant made no confession. Thus, when Agent Curtis, cloaked with the expertise of an F.B.I. agent, offered his opinion that the defendant had impliedly acknowledged his guilt, his testimony undoubtedly carried substantial weight with the jury. The crimes charged were heinous, the evidence entirely circumstantial, and what better place for a jury to repose confidence than in an F.B.I. agent's expertise. I cannot find this error to be harmless.

### III.

The majority does not even address whether the trial court erred in admitting the testimony of the F.B.I. serologist as to the analysis of bloodstains found at the defendant's residence, relegating this issue to a footnote.[5] I believe resolution of this question demonstrates further the majori-

---

**4.** It is difficult to even conceive serious scientific consideration be given to such a subjective endeavor. Even if I could conceive of it, I would reject such body language interpretation for the same reason that we rejected the lie detector as appropriate evidence in *State v. Frazier*, 162 W.Va. 602, 252 S.E.2d 39 (1979), and the horizontal gaze nystagmus test in *State v. Barker*, 179 W.Va. 194, 366 S.E.2d 642 (1988).

**5.** Note 2 of the majority opinion states that this issue was not fairly raised. 184 W.Va. at 126, 399 S.E.2d at 837. However, the issue was

clearly raised by motion *in limine* prior to trial. In Syllabus Point 1 of *Wimer v. Hinkle*, 180 W.Va. 660; 379 S.E.2d 383 (1989), we stated:

"An objection to an adverse ruling on a motion in limine to bar evidence at trial will preserve the point, even though no objection was made at the time the evidence was offered, unless there has been a significant change in the basis for admitting the evidence."

*See State v. Weaver*, 181 W.Va. 274, 382 S.E.2d 327 (1989); *Bennett v. 3 C Coal Co.*, 180 W.Va. 665, 379 S.E.2d 388 (1989).

ty's disregard of the law in order to reach a desired result.

The evidence at trial revealed that approximately twenty samples of what appeared to be bloodstains taken from the defendant's home and from Cathy Ford's vehicle were analyzed. F.B.I. Agent Audrey Lynch, a forensic serologist, testified that her analysis of these samples demonstrated that one contained human protein, but could not be confirmed as containing blood, five contained blood which could not be confirmed as human, and the remainder contained human blood.

These stains were extremely minute in quantity and only three were found to contain recognized genetic markers. However, because of the small quantity available for test purposes, only one exhibit (Q 134) was found to contain more than one genetic marker.[6] The testing process also destroyed the samples, leaving the defendant with no opportunity to have the test results verified. Finally, and most importantly, the State's DNA expert admitted that because of the smallness of the sample, there was no way to determine wheth-

er these bloodstains came from the same person.

In addition, a cigarette butt of the brand smoked by Cathy Ford found in a corner of the defendant's living room was tested. Traces of saliva found on the filter demonstrated that the smoker had been a Type A secretor. A DNA testing expert had previously testified that his analysis of exhibit Q 134 had revealed that the blood had come from a female.

There was no known blood sample from Cathy Ford which could be used for comparison. Agent Lynch, therefore, was given samples of blood from Cathy Ford's parents. After testing for the same genetic markers, Agent Lynch testified that the bloodstains analyzed in the course of the police investigation could have come from an offspring of the Fords.[7]

Thereafter, Agent Lynch was asked to compute the percentage of the population which would carry all of the genetic markers found in the samples analyzed in the criminal investigation. She ultimately concluded that they would occur in approximately .75 percent of the population.[8]

---

**6.** A bloodstain taken from a floor joist of the defendant's bedroom showed the presence of phosphoglucomutase, a blood enzyme (PGM type 1 + 2 +). A bloodstain on a paper towel taken from a trash bin in the defendant's living room or kitchen exhibited the serum protein haptoglobin (Hp type 1). Exhibit Q 134, a wooden brace which ran from the bottom of the defendant's trailer to the ground, was found to contain the PGM type 1 + 2 + marker as well as an enzyme, erythrocyte acid phosphatase (EAP type BA).

**7.** The tests demonstrated that Cathy Ford's father had Type O blood and carried the following genetic markers: PGM type 1 + 2 +; EAP type BA; Hp type 1. Cathy Ford's mother had Type A blood with the following genetic markers: PGM type 1 +; EAP type BA; Hp type 1. Agent Lynch testified that the offspring of these two people would have to carry the Hp type 1 marker and that the other test results were not inconsistent with the characteristics that might be found in the blood of such offspring.

**8.** The testimony at trial was as follows:
 "Q. What percentage of the population has a blood type A?
 "A. Approximately forty percent of the population.

 "Q. What percentage of the population has a blood type A and are secretors?
 "A. Approximately thirty-two percent of the population.
 "Q. What percent of the population has a genetic marker of PGM 1 + 2 +?
 "A Approximately twenty-two percent of the population.
 "Q What percent of the population has a Haptoglobin of 1?
 "A Approximately 16.5 percent.
 "Q What percent of the population has a combination of PGM 1 + 2 + and BA, or EAP of BA?
 "A Approximately nine percent.
 "Q Agent Lynch, what percent of the population has a PGM of 1 + 2 +, an EAP of BA, and an HP of 1?
 "A Approximately 1.5 percent.
 * * *
 "Q So that would include both male and female?
 "A Correct."
The .75 percent figure was arrived at by dividing the final number in half to reflect the DNA expert's determination that the bloodstain on exhibit Q 134 had come from a female.

The defendant does not challenge the scientific basis of the bloodstain and saliva analyses or of the DNA testing. Instead, the defendant challenges the conclusions of Agent Lynch, asserting that it was error to allow her to testify, in effect, that the bloodstains found at the defendant's trailer could have come from Cathy Ford based on her analysis of the victim's parents' blood and to offer statistical analysis as to the percentage of the population with the same genetic markers revealed by the analysis.

This Court has recognized that the results of properly conducted and generally recognized blood tests are admissible at trial if they are relevant to some issue. *State v. Wyant,* 174 W.Va. 567, 328 S.E.2d 174 (1985); *State v. Kopa,* 173 W.Va. 43, 311 S.E.2d 412 (1983). *See State v. Clements,* 175 W.Va. 463, 334 S.E.2d 600, *cert. denied,* 474 U.S. 857, 106 S.Ct. 165, 88 L.Ed.2d 137 (1985). In *State v. Woodall, supra,* we stated the general proposition that statistical probability evidence is admissible with respect to blood analysis evidence.[9]

In *Woodall,* however, we also recognized the dangers inherent in the use of statistical evidence based on blood tests where the premise on which such evidence rests is faulty:

"In the celebrated case *People v. Collins,* 68 Cal.2d 319, 66 Cal.Rptr. 497, 438 P.2d 33 (1968), the defendants were an inter-racial couple. A witness described the robbers as a white woman and a black man who left the scene in a yellow car. The prosecution conjectured that 1 in 10 cars is yellow, and that 1 in 1,000 couples inter-racial. Thus the jury was given the figure of 10,000 to 1 odds the defendants were guilty.

"In *Collins,* the underlying statistics were wholly conjectural.... Fearing the jury might have seized on the 1 in 10,000 figure to convict, the California Supreme Court reversed the trial court. *See generally* G. Lilly, *An Introduction*

*to the Law of Evidence,* 496–99 (1987)." 182 W.Va. at 23, 385 S.E.2d at 261.

I believe a similar flaw underlies the testimony of Agent Lynch in this case. The most obvious problem is that the three blood samples which were used to obtain the genetic markers could not be identified as coming from the same person. Yet, this was the very premise on which the State built its case. The parents' blood was analyzed for the same markers as if they had come from a common source. I know of no court which has sanctioned such an approach.

The same distortion occurred in the statistical probability questions which are set out in note 8, *supra.* When the questions combine the genetic markers to elicit smaller probability answers, the fundamental premise is that the markers came from a common blood source. As previously pointed out, this is not the fact.

I believe it was error to permit the State's blood expert to testify with regard to the genetic markers as they relate to the parents' blood and to the statistical probabilities when combined.

I am authorized to state that Justice McHUGH joins me in this dissent.

---

**9.** In *Woodall,* 182 W.Va. at 23–24, 385 S.E.2d at 261–62, we stated:

"Blood type and enzyme tests have general scientific acceptance, and the distribution of particular blood traits in the population is ascertainable. [G. Lilly, *An Introduction to*

*the Law of Evidence* 496] at 499–504 [ (1987) ]. The party seeking to impeach blood test evidence is free to cross-examine the proponent's experts and offer experts of his own to discredit the conduct of the tests and the underlying statistical probabilities."