569 S.E.2d 211

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Ray Lewis DILLINER, Defendant Below, Appellant.**

No. 29993.

Supreme Court of Appeals of West Virginia.

Submitted May 1, 2002.

Decided July 2, 2002.

Concurring Opinion of Justice Starcher, July 26, 2002.

George J. Cosenza, Esq., Cosenza, Underwood & Merriman, Parkersburg, West Virginia, Attorney for Appellant.

Darrell V. McGraw, Jr., Esq., Attorney General, Scott E. Johnson, Esq., Senior Assistant Attorney General, Charleston, West Virginia, Attorney for Appellee.

MAYNARD, Justice:

This case is before this Court upon appeal of a final order of the Circuit Court of Wood County entered on October 4, 2000. In that order, the circuit court sentenced the appellant and defendant below, Ray Lewis Dilliner, to one-to-three years in the penitentiary and imposed a $3,000.00 fine for his conviction of third offense driving under the influence of alcohol (hereinafter "third offense DUI"). In this appeal, the appellant contends that the circuit court erred by not setting aside the guilty verdict because it was inconsistent with special interrogatories answered by the jury. The appellant also contends that the circuit court erred by admitting into evidence the results of his intoxilyzer test.

This Court has before it the petition for appeal, the entire record, and the briefs and argument of counsel. For the reasons set forth below, the final order of the circuit court is reversed and this case is remanded for a new trial.

## I. FACTS

On September 19, 1999, at approximately 12:30 a.m., the appellant was stopped as he was driving south on Grand Central Avenue in Vienna, West Virginia, by Sergeant G.M. Deem of the Vienna Police Department. According to Sergeant Deem, he stopped the appellant because his vehicle was weaving and drifting into the next lane. When Sergeant Deem approached the appellant, he

noticed the odor of alcohol. He asked the appellant if he had been drinking, and the appellant replied that he had not. Sergeant Deem then asked the appellant to exit his vehicle and perform a series of field sobriety tests.[1]

The appellant passed the first series of field sobriety tests but failed the horizontal gaze nystagmus test and the preliminary breath test. Consequently, the appellant was taken to the police station and given an intoxilyzer test which showed a blood alcohol concentration of .156 percent. The appellant was arrested. Subsequently, he was indicted for third offense DUI and driving a motor vehicle with an alcohol concentration in his blood of ten hundredths of one percent or more by weight. The indictment alleged that the appellant has been previously convicted of DUI twice in Marietta, Ohio.[2]

Prior to trial, the appellant moved to suppress the results of his intoxilyzer test, but the motion was denied. At trial, the appellant testified that he had not consumed any alcohol during the twenty-four hour period immediately prior to his arrest. He further testified that he owned a body shop and that hours before his arrest he had painted an automobile without using a protective mask. The appellant maintained that the vapors from the paint and other chemicals he used while painting accounted for the results of his intoxilyzer test.

In support of his testimony, the appellant presented the expert testimony of Robert J. Belloto, Jr., R.Ph., Ph.D. Dr. Belloto testified that he had examined the various chemical products used by the appellant to paint the automobile before his arrest. He further testified that these chemicals metabolize in the human body in such a manner that they are expelled as alcohol and thus could cause a false reading on an intoxilyzer test.

Thereafter, the jury found the appellant guilty of both counts in the indictment. In response to interrogatories relating to their findings of guilt, the jury indicated the verdicts were based upon a combination of the appellant drinking alcohol and inhaling chemicals while painting his car. The jury further indicated that it did not believe that the appellant inhaled the chemicals to cause himself to become intoxicated. Based on the jury's responses to the interrogatories, the appellant moved to set aside the verdicts. Alternatively, the appellant requested a new trial. After considering the motions, the circuit court set aside the verdict on count two, driving a motor vehicle with an alcohol concentration of ten hundredths of one percent or more, by weight, and entered a not guilty verdict. However, the court denied the motion with regard to the first count and sentenced the appellant to one-to-three years in the penitentiary and imposed a $3,000.00 fine. This appeal followed.

## II.  DISCUSSION

### A.  The Special Interrogatories

The appellant first contends the jury's finding of guilt with respect to the third offense DUI charge was inconsistent with its answers to the special interrogatories, and, therefore, the circuit court erred by not setting aside his conviction. As noted above, after the jury returned its guilty verdict, the circuit court asked the jury to answer special interrogatories relating to their findings of guilt. The interrogatories with respect to the third offense DUI charge and the jury's answers thereto were as follows:

> You have found the Defendant guilty of driving under the influence of alcohol by being under the influence of alcohol. Was this verdict as a result of the Defendant: (Check all appropriate lines)
>
> _____ drinking alcohol
>
> _____ painting his car and inhaling the chemicals
>
> √ a combination of both
>
> If you find that the Defendant was driving under the influence of alcohol as a result of painting his car and inhaling the chemicals, do you further find that the painting of his car was done in such a

---

1. These tests were captured on videotape and were viewed by the jury during the appellant's trial.

2. The appellant stipulated to these convictions at trial.

manner to knowingly cause himself to become intoxicated?

_____ Yes    ✓   No

The appellant claims that the jury's answers to the interrogatories clearly establish that the jury did not find him guilty of driving under the influence as set forth in W.Va. Code § 17C–5–2(k) (1996). While we understand the appellant's argument, we reverse the appellant's conviction for a different reason.

■ This Court has long since held that special interrogatories should not be submitted to juries in criminal cases. In *State v. Boggs*, 87 W.Va. 738, 749, 106 S.E. 47, 51–52 (1921), this Court stated that:

> Statutes permitting findings to be required in response to interrogatories are held not to apply to criminal cases, for the reason that to so apply them would be to impair the right of trial by jury secured by the Constitution. It is one of the most essential features of the right of trial by jury that no jury should be compelled to find any but a general verdict in criminal cases, and the removal of this safeguard would violate its design and destroy its spirit.

(Citation omitted). This Court concluded in *Boggs* that "special interrogatories cannot be propounded to the jury in criminal cases." *Id.*, 87 W.Va. at 749–50, 106 S.E. at 52. In *State v. Bowles*, 109 W.Va. 174, 176, 153 S.E. 308, 308 (1930), this Court reiterated that "[t]he practice of submitting interrogatories is not followed in the trial of criminal cases." Finally, in Syllabus Point 5 of *State v. Greater Huntington Theatre Corp.*, 133 W.Va. 252, 55 S.E.2d 681 (1949), this Court held that "[W.Va.] Code, 56–6–5, which provides for the submission of interrogatories to a jury in the trial of any issue or issues does not apply to trials in criminal cases."

■ While the issue of submitting special interrogatories to juries in criminal cases has not come before this Court since *State v. Greater Huntington Theatre Corp.*, several other jurisdictions have addressed the issue more recently. Generally, special interrogatories in criminal cases remain disfavored and discouraged. *United States v. Acosta*, 149 F.Supp.2d 1073, 1075 (E.D.Wis.2001). It is believed that special interrogatories may "coerce the jurors into rendering a guilty verdict," *State v. Sheldon*, 301 N.W.2d 604, 614 (N.D.1980), or "destroy [ ] the ability of the jury to deliberate upon the issue of guilt or innocence free of extraneous influences." *State v. Simon*, 79 N.J. 191, 199, 398 A.2d 861, 865 (1979). *See also United States v. Sababu*, 891 F.2d 1308, 1325 (7th Cir.1989) (special verdicts are disfavored in criminal cases because they conflict with the basic tenet that juries must be free from judicial control and pressure in reaching their verdicts); *United States v. Coonan*, 839 F.2d 886, 891 (2d. Cir.1988) (there is some belief that eliciting "yes" and "no" answers to questions concerning the elements of an offense may propel a jury toward a logical conclusion of guilt whereas a more generalized assessment might result in an acquittal); *United States v. O'Looney*, 544 F.2d 385, 392 (9th Cir.1976) (danger that special verdicts might be devices for bringing judicial pressure to bear on juries in reaching their verdicts).

Although some courts have permitted the use of special interrogatories in criminal cases,[3] we believe that they should not be permitted except where provided for by statute. Since *State v. Greater Huntington Theatre Corp.* was decided, the Legislature has provided for the submission of special interrogatories to juries in criminal cases in certain limited circumstances.[4] Primarily, the

---

3. *See State v. Steen*, 615 N.W.2d 555, 559 (2000) (special interrogatories approved in criminal trials where the special findings benefitted the defendant, were neither inherently prejudicial, nor predeterminative of the jury's verdict); *People v. Ribowsky*, 77 N.Y.2d 284, 291, 567 N.Y.S.2d 392, 568 N.E.2d 1197, 1201 (1991) (special interrogatories not prejudicial to defendant because they allowed the court to verify that the jury followed its instructions); *Commonwealth v. Golston*, 373 Mass. 249, 260–61, 366 N.E.2d 744, 752 (1977)

(submitting two questions to jury to answer if they found defendant guilty of murder not error).

4. *See, e.g.*, W.Va.Code § 62–12–2 (1999) (providing for the submission of a special interrogatory to the jury for the purpose of determining an accused's eligibility for probation where it is alleged that the accused attempted to commit a felony with the use, presentment, or brandishing of a firearm); W.Va.Code § 60A–4–406 (2000) (providing for the submission of a special interrogatory to the jury to determine whether an

statutory authorization of special interrogatories in criminal cases is for sentencing purposes. In that context, the reasons for prohibiting the use of special interrogatories do not exist.

■ However, special interrogatories like those used in the case at bar invade the province of the jury. There is the strong possibility that such special interrogatories will lead the jury to believe that the court wants a particular verdict. Additionally, special interrogatories infringe upon the power of the jury to arrive at a general verdict without having to support it by reasons. Simply put, special interrogatories in criminal cases are contrary to the basic principle of law that jury deliberations should be free from extraneous influences. Therefore, we hold that the submission of special interrogatories to a jury in a criminal case when not authorized by statute constitutes reversible error. Accordingly, the appellant's conviction is reversed, and this case is remanded for a new trial.

### B. The Accuracy Inspection Report

■ While we reverse the appellant's conviction because the circuit court erred by submitting the special interrogatories to the jury, we feel it is necessary to address another assignment of error raised by the appellant. The appellant also contends that the circuit court erred by admitting into evidence the intoxilyzer accuracy inspection report and the results of his intoxilyzer test. During his trial, the State offered the accuracy inspection report as foundational evidence to support the admission of the appellant's actual breath test results. The State presented the accuracy inspection report to establish that the intoxilyzer machine used to test the appellant's blood alcohol level had been checked for accuracy in compliance with the requirements of the West Virginia Division of Health. The appellant objected to the admission of the report asserting that it was hearsay. However, the circuit court allowed the accuracy inspection report to be admitted into evidence without testimony from its author or any other person. Specifically, the circuit court concluded that since the docu-

ment was authentic pursuant to Rule 902 of the West Virginia Rules of Evidence, it was also reliable, and therefore admissible. The appellant now argues that the circuit court erred in its finding. According to the appellant, even though a document is authentic, it still must conform to the other evidentiary rules prior to its admission.

The State concedes that the circuit court erred by concluding that a finding of authenticity can be equated with a finding of admissibility against a hearsay objection, and acknowledges this Court's statement in *State v. Jenkins*, 195 W.Va. 620, 625, 466 S.E.2d 471, 476 (1995):

> A trial judge's finding of authenticity does not guarantee admissibility. The trial judge also must evaluate whether the evidence is admissible pursuant to the rules of evidence governing relevancy, hearsay, privileges, or any other applicable rules of evidence.

The State maintains, however, that the accuracy inspection report was admissible as a public record pursuant to Rule 803(8)(B) of the West Virginia Rules of Evidence so that the appellant's conviction should not be reversed. According to Rule 803(8)(B) of the West Virginia Rules of Evidence:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> (8) Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel[.]

According to the State, the accuracy inspection report falls squarely within the confines of W.Va.R.Evid. 803(8) because 64 C.S.R. § 10–7.1(f) requires that "[t]he designated instrument shall have its accuracy checked in accordance with subsection 7.2 of this rule. Each law enforcement agency shall maintain a record of such accuracy

accused convicted of distribution of a controlled substance is eligible for parole).

checks including the type of test employed and the date of such accuracy checks." Further, 64 C.S.R. § 10–7.3(c) requires that the individual testing the intoxilyzer machine must be a certified breath test operator. Therefore, concludes the State, the Code of State Rules requires the accuracy test to be performed, thus making it a matter "observed pursuant to duty imposed by law" as stated in Rule 803(8)(B), and a record of such accuracy checks must be maintained, thus making it a matter of which there is "a duty to report," as stated in Rule 803(8)(B).

The appellant responds that Rule 803(8)(B) specifically excludes reports of matters observed by police officers and other law enforcement personnel. Because in the instant case, the accuracy inspection test was performed by D.W. DeBord, a sergeant in the Parkersburg division of the West Virginia State Police, the appellant concludes that the report would not be admissible.

We agree with the State that the accuracy inspection report was admissible under W.Va.R.Evid. 803(8)(B) because we find that the law enforcement exclusion in Rule 803(8)(B) is not applicable to the instant circumstances. The State directs our attention to a leading evidentiary treatise on the Federal Rules of Evidence which explains:

In adding the exclusionary clauses, Congress was responding to one dominant concern: that law enforcement officers would create dossiers purporting to describe accurately the actions of criminal defendants and that these dossiers would be offered in lieu of live testimony. Such evidence was thought to be unreliable and was barred in criminal cases if offered against the defendant.

. . . .

Under the predominant view, laboratory reports and the like are admissible, because the Rule is designed to exclude a different type of report, i.e., police-generated reports that are prepared under adversarial circumstances, which are subject to manipulation by authorities bent on convicting a particular criminal defendant.

3 Stephen A. Saltzburg, et al., *Federal Rules of Evidence Manual* 1684 (7th ed.1998). In addition, we are persuaded by the reasoning

of the courts in *United States v. Wilmer,* 799 F.2d 495 (9th Cir.1986); *Steiner v. State,* 706 So.2d 1308 (Ala.Crim.App.1997); and *State v. Ruiz,* 120 N.M. 534, 903 P.2d 845 (N.M.Ct. App.1995).

In *Wilmer,* the defendant was convicted of driving while intoxicated and his license was suspended based on events occurring at an air force base. The United States Court of Appeals for the Ninth Circuit found that evidence of the calibration certificate of the maintenance officer who calibrated the breathalyzer machine was admissible under Rule 803(8). The court rejected the defendant's challenge to the report's admissibility based on the law enforcement exclusion in Rule 803(8)(B). Specifically, the court recognized that "the exclusionary provisions of Rule 803(8)(B) were intended to apply to observations made by law enforcement officials at the scene of a crime or the apprehension of the accused and not 'records of routine, nonadversarial matters' made in a nonadversarial setting." *Wilmer,* 799 F.2d at 500–01 (citation omitted).

Likewise, in *Steiner,* the defendant challenged the introduction into evidence of the logbook indicating that the Intoxilyzer 5000 machine was properly calibrated on the basis that the logbook fell within the law enforcement exception because the machine was tested by a State Trooper. The Court of Criminal Appeals of Alabama rejected this challenge. The court reasoned:

Other jurisdictions have applied the law enforcement exception "only to matters observed or investigated by police in adversarial, investigative circumstances where those involved may well have a motivation to misrepresent in order to secure a conviction." Charles Gamble, *McElroy's Alabama Evidence,* § 266.01(5) (5th ed.1996) (citations omitted). The inspection of the calibration of the I–5000 is an administrative function that is not performed pursuant to the investigation of any particular person. Therefore, we hold that a certified copy of the logbook relating to the I–5000 is admissible under the business records exception to the rule against hearsay when offered to show that the device was

inspected to insure that the device had been properly calibrated.

*Steiner,* 706 So.2d at 1312.

Finally, in *Ruiz,* · the Court of Appeals of New Mexico found that a calibration log and intoxilyzer printout were admissible under Rule 803(8), and not excluded by the law enforcement exclusion in that rule. The Court explained:

> Courts in other jurisdictions have considered the law enforcement limitation on the business or public records exceptions. These courts generally have ruled that language patterned on Federal Rule of Evidence 803(8) "does not prohibit introduction of records of a routine, intra-police, or machine maintenance nature, such as intoxilyzer calibration logs." *Ward,* 474 N.E.2d at 302; *see United States v. Wilkinson,* 804 F.Supp. 263, 266–67 (D.Utah 1992); *Huggins,* 659 P.2d at 616. In affirming the admission of certificates indicating routine breathalyzer inspections by police personnel, the Oregon Court of Appeals outlined the parameters of the law enforcement limitations and the hearsay rule:

> > We conclude that, in adopting [Federal Rule of Evidence] 803(8)(B), Congress did not intend to change the common law rule allowing admission of public records of purely "ministerial observations." Rather, Congress intended to prevent prosecutors from attempting to prove their cases through police officers' reports of their observations during the investigation of crime.

> > .  .  .  .  .

> > [T]he certificates of breathalyzer inspections do not concern observations by the police officers in the course of a criminal investigation. Rather, they relate to the routine function of testing breathalyzer equipment to insure that it gives accurate readings. *See United States v. Grady, supra,* 544 F.2d [598] at 604. The testing and certification under [Oregon Revised Statute] 487.815(3)(c) is not done in the adversarial context of a particular case that might cloud law enforcement personnel's perception. A review of the congressional debate reveals

that [Federal Rule of Evidence] 803(8)(B) was intended to preclude only the admission of police reports made in the course of investigation of a particular crime in lieu of the officers' in court testimony, not records of routine, nonadversarial matters such as those in question here.

*State v. Smith,* 66 Or.App. 703, 675 P.2d 510, 512 (1984). *Ruiz,* 120 N.M. at 538, 903 P.2d at 849.

█ We agree with the reasoning in the cases discussed above. The accuracy inspection report of an intoxilyzer sets forth matters observed pursuant to a duty imposed by the Code of State Rules which also requires that these matters be reported. Accordingly, we hold that a record of the accuracy inspection of an intoxilyzer or breathalyzer machine performed by a certified breath test operator and prepared in accordance with 64 C.S.R. §§ 10–7.1, *et. seq.,* is admissible under the public records exception to the hearsay rule found in W.Va.R.Evid. 803(8)(B). Further, we hold that the law enforcement limitation on admissibility of public records found in W.Va.R.Evid. 803(8)(B) does not prohibit the admission under Rule 803(8)(B) of a record of the accuracy inspection of an intoxilyzer machine performed by a certified breath test operator and prepared in accordance with 64 C.S.R. §§ 10–7.1, *et seq.,* where the certified breath test operator is a law enforcement officer. The accuracy check of an intoxilyzer is an administrative function that is not performed pursuant to the investigation of any particular person.

We emphasize, however, that a defendant may subpoena and compel the attendance at court of the certified breath test operator who conducted the accuracy inspection of the intoxilyzer and examine the operator concerning his or her compliance with the applicable rules and methodology in conducting the inspection. Should a defendant choose to subpoena that person, the State has a responsibility to have the certified operator available and responsive to timely process.

Moreover, we find that the admission of an accuracy inspection report pursuant to the West Virginia Rules of Evidence does not

violate the appellant's constitutional right to confront witnesses. This Court has held that when the challenged extrajudicial statement was not made in a prior judicial proceeding, the only requirement for admission of the extrajudicial statement under the Confrontation Clause is proving the reliability of the witness's out-of-court statement. *See* Syllabus Point 2, *State v. James Edward S.*, 184 W.Va. 408, 400 S.E.2d 843 (1990); Syllabus Point 2, *State v. Kennedy*, 205 W.Va. 224, 517 S.E.2d 457 (1999). We have further recognized that "reliability can usually be inferred where the evidence falls within a firmly rooted hearsay exception." *James Edward S.*, 184 W.Va. at 414, 400 S.E.2d at 849. The public records exception in W.Va.R.Evid. 803(8) is a firmly rooted hearsay exception. *Kennedy*, 205 W.Va. at 230, 517 S.E.2d at 463 ("Numerous courts have recognized the fact that the public records exception is a firmly established exception which satisfies the Confrontation Clause").

As noted above, the accuracy inspection report was admitted by the circuit court on improper grounds. We have held, however, that " '[t]his Court may, on appeal, affirm the judgment of the lower court when it appears that such judgment is correct on any legal ground disclosed by the record, regardless of the ground, reason or theory assigned by the lower court as the basis for its judgment.' Syl. Pt. 3, *Barnett v. Wolfolk*, 149 W.Va. 246, 140 S.E.2d 466 (1965)." Syllabus Point 5, *Hustead on Behalf of Adkins v. Ashland Oil, Inc.*, 197 W.Va. 55, 475 S.E.2d 55 (1996). Based on the above discussion, we find that the accuracy inspection report was properly admissible pursuant to W.Va.R.Evid. 803(8)(B). Therefore, we find no error in the admission of the accuracy inspection report.[5]

### III. CONCLUSION

Accordingly, for the reasons set forth above, the appellant's conviction is reversed, and this case is remanded for a new trial.

Reversed and remanded.

---

5. We also find no merit to the appellant's claim that the State did not show a sufficient chain of custody for the simulator test fluid used by the police department as part of the process to test the appellant's breath for blood alcohol content.

1. *W.Va.Code*, 17C–5–2 [2001] prohibits operating a motor vehicle while "under the influence of

STARCHER, Justice, concurring:

(Filed July 26, 2002)

I concur with the Court's judgment. I write separately to point out that despite intimations to the contrary in some opinions, including the Court's opinion in the instant case, West Virginia law does *not* permit the admission of horizontal gaze nystagmus ("HGN") evidence as substantive evidence of intoxication, without the reliability of the HGN evidence being shown.

This Court's leading case on horizontal gaze nystagmus in connection with the proof of intoxication[1] is *State v. Barker*, 179 W.Va. 194, 366 S.E.2d 642 (1988). The following language from *Barker* is explanatory on the general subject of HGN, and shows the concerns that this Court had in that case:

The HGN test is based on the principle that consumption of alcohol causes nystagmus. Nystagmus is the rhythmic oscillation of the eyes in a horizontal, vertical or rotary direction. * * * Nystagmus can be congenital or can be caused by a variety of conditions affecting the brain, including ingestion of drugs such as alcohol or barbiturates. * * * In general, "[i]n order for a scientific test to be initially admissible, there must be general acceptance of the scientific principle which underlies the test." There are some scientific tests, such as ballistics tests, fingerprint identification, and blood tests, which are so generally accepted in the scientific community that a trial court may take judicial notice of their reliability. * * * In the present case, the State offered no evidence to demonstrate the reliability of either the HGN test or the scientific principle upon which the HGN test is based, i.e., that alcohol consumption causes nystagmus. The only testimony regarding the HGN test came

alcohol, controlled substances or drugs." In this separate opinion, I use the term "intoxication" as a shorthand term to mean this condition. Other terms commonly used in the law for this condition are "impaired" or "under the influence."

from Officer Davis. Officer Davis told the jury that the HGN test "consists of the measurement of the horizontal movement of the eye as it is affected by alcohol," and described how he performed the test. He also described the reaction of a sober person's eye to the test, and how that reaction is affected by consumption of alcohol. *He did not, however, address the scientific reliability of the test. We, therefore, find that the lower court erred in admitting Officer Davis' testimony concerning the HGN test.*

*One of the dangers inherent in expert testimony in regard to scientific tests is that the jury may not understand the exact nature of the test and the particular methodology of the test procedure, and may accord an undue significance to the expert testimony. It therefore seems reasonable to require, as we did in* Clawson, *some in camera disclosure of the methodology, scientific reliability, and results of the HGN test, as well as evidence of whether accepted test procedures were followed by qualified personnel in a particular case. A demonstration of reliability should include both testimony by expert witnesses and relevant articles and scholarly publications. * * * Even if the HGN* test were found to be reliable, and its results admissible, we would be left with the question of whether estimates of blood alcohol content based on a driver's performance of the HGN test are admissible. The HGN test is a field sobriety test. A police officer's testimony as to a driver's performance on other field sobriety tests like finger-to-nose or walking the line, is admissible at trial as evidence that the driver was under the influence of alcohol. From the evidence presented, we are not convinced that the HGN test should be entitled to any more evidentiary value than other field sobriety tests. We note that unlike the blood, breath, and urine tests, the HGN test has not been recognized by our state legislature as a method for measuring blood alcohol content. We, therefore, find that even if the reliability of the

HGN test is demonstrated, an expert's testimony as to a driver's performance on the test is admissible only as evidence that the driver was under the influence. Estimates of blood alcohol content based on the HGN test are inadmissible. *Because the State did not introduce evidence of the scientific reliability of the test in this case, we do not reach the question of whether the HGN test is sufficiently reliable to be admissible.*

179 W.Va. at 196–198, 366 S.E.2d at 644–646 (emphasis added, citations omitted).

This Court held in *Barker* that HGN evidence is scientific evidence, and that there must be expert testimony as to the evidence's reliability as evidence of intoxication. In *Barker* we categorically refused to allow the HGN testimony of the police officer to come in *at all*, because there was no evidence showing the HGN evidence's scientific reliability as proof of intoxication.

Notably, in *State v. Ferrell*, 184 W.Va. 123, 138 n. 4, 399 S.E.2d 834, 849 n. 4 (1990), former Justice Thomas Miller, one of our state's most learned writers in the area of scientific and technical evidence, stated that in *State v. Barker* this Court had "rejected . . . the horizontal gaze nystagmus test[.]" *Id.*

We also held in Syllabus Point 2 of *Barker* that *if* the HGN evidence were determined to be scientifically reliable to show that a person is intoxicated, and therefore admissible, the HGN evidence could not in any event be used to show a certain blood alcohol level, but *at best* as a "field sobriety test" to circumstantially show that a driver was probably intoxicated.

The great weight of authority among courts is that HGN evidence is scientific evidence. *See generally, United States v. Horn*, 185 F.Supp.2d 530 (D.Md.2002).[2] The persuasive force of HGN evidence rests almost entirely upon an assertion of scientific legitimacy rather than a basis of common knowledge. *People v. Williams*, 3 Cal. App.4th 1326, 5 Cal.Rptr.2d 130 (5th Dist.

---

**2.** *U.S. v. Horn* is a recent case that contains what appears to be at this time the most comprehensive discussion and up-to-date survey of the many state law cases on HGN evidence; I discuss *U.S. v. Horn* further *infra.*

1992). In *State v. Murphy*, 953 S.W.2d 200 (Tenn.1997), the court stated that testimony linking HGN to intoxication is "scientific, technical, or other specialized knowledge" and therefore must be offered through an expert witness. *See also State v. Duffy*, 146 N.H. 648, 778 A.2d 415 (2001); *State v. Doriguzzi*, 334 N.J.Super. 530, 760 A.2d 336 (2000); *State v. Torres*, 127 N.M. 20, 976 P.2d 20 (1999); *Duffy v. Director of Revenue*, 966 S.W.2d 372 (Mo.Ct.App.1998); *State v. Helms*, 348 N.C. 578, 504 S.E.2d 293 (1998); *Young v. City of Brookhaven*, 693 So.2d 1355 (Miss.1997); *Com. v. Sands*, 424 Mass. 184, 675 N.E.2d 370 (1997); *Com. v. Apollo*, 412 Pa.Super. 453, 603 A.2d 1023 (1992); *People v. Erickson*, 156 A.D.2d 760, 549 N.Y.S.2d 182 (1989).

*West Virginia Rules of Evidence*, Rule 702, requires that scientific test results, in order to be admissible, be relevant and reliable. *Watson v. Inco Alloys Intern., Inc.*, 209 W.Va. 234, 239, 545 S.E.2d 294, 299 (2001). There is a category of evidence based on scientific methodology that is so longstanding and generally recognized that it may be judicially recognized, and, therefore, a trial court need not separately ascertain the basis for its reliability. Syllabus Point 1, *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993).[3]

In *State v. Witte*, 251 Kan. 313, 836 P.2d 1110, 1119–1120 (1992), the court discussed the mixed state of scientific opinion regarding the reliability of HGN evidence. The court stated:

> Our research indicates that the reaction within the scientific community is mixed. Some articles endorse the HGN testing and its accuracy. Other articles discuss concerns with the HGN test. * * * In addition to intoxication, many other factors can cause nystagmus.
>
> Nystagmus can be caused by problems in an individual's inner ear labyrinth. In fact, irrigating the ears with warm or cold water, not a farfetched scenario under particular weather conditions, is a source of error. Physiological

problems such as certain kinds of diseases may also result in gaze nystagmus. Influenza, streptococcus infections, vertigo, measles, syphilis, arteriosclerosis, muscular dystrophy, multiple sclerosis, Korsakof's Syndrome, brain hemorrhage, epilepsy, and other psychogenic disorders all have been shown to cause nystagmus. Furthermore, conditions such as hypertension, motion sickness, sunstroke, eyestrain, eye muscle fatigue, glaucoma, and changes in atmospheric pressure may result in gaze nystagmus. The consumption of common substances such as caffeine, nicotine, or aspirin also lead to nystagmus almost identical to that caused by alcohol consumption.

> Temporary nystagmus can occur when lighting conditions are poor.

> An individual's circadian rhythms (biorhythms) can affect nystagmus readings— the body reacts differently to alcohol at different times of the day. One researcher has suggested that because of this, the angle of onset should be decreased five degrees between midnight and 5 a.m. A number of driving under the influence arrests occur after midnight, which "would seem to indicate that sensitivity of HGN to alcohol is enhanced during the hours of the day when the greatest number of drunk driving arrests occur."

> A prosecution-oriented group in California conducted its own research:

>> The study measured the correlation of police officer estimations of the angle of onset of nystagmus against chemical tests involving breath and blood samples. The data in the study revealed that there was virtually no correlation between the actual value of blood alcohol concentration and the predicted value based upon the angle of onset of nystagmus.
>>
>> ... This study points out the fact that horizontal gaze nystagmus tests should never be intended as a substi-

---

**3.** Expert testimony concerning generally recognized tests is presumptively admissible and the burden of excluding such testimony is upon the side seeking exclusion. When a test is novel or not generally accepted, however, that circumstance alone meets the threshold requirement of rebutting any presumption of admissibility under this rule and the burden of proof that the test is reliable remains on the proponent. *State v. Woodall*, 182 W.Va. 15, 385 S.E.2d 253 (1989).

tute for actual blood or breath alcohol testing. The purpose of the procedure, if any is strictly a field screening function, like other presumptive tests. 836 P.2d at 1119–1120 (citations omitted). The court concluded in *State v. Witte* that the State had not established the scientific reliability of the HGN evidence, and that the police officer's testimony about his observations could not establish that reliability. *Accord, State v. Chastain,* 265 Kan. 16, 22, 960 P.2d 756, 761 (1992).

In *Young v. City of Brookhaven,* 693 So.2d 1355 (Miss.1997), the Supreme Court of Mississippi held that the only allowable use of HGN evidence is to establish probable cause to arrest and administer breath or blood tests. The court delivered a "stern warning concerning using the HGN test for reasons other than to establish probable cause. The State cannot use the results of the HGN test merely as an indicator to show that the defendant was 'under the influence of intoxicating liquor' ...." 693 So.2d at 1361. *In accord, Richbourg v. State,* 744 So.2d 352, 354 (Miss.Ct.App.1999). *See also Graves v. State,* 761 So.2d 950, 953 (Miss.Ct.App.2000) (an officer could testify about doing an HGN evaluation only to show probable cause to arrest a defendant and administer a breathalyzer, rather than for the impermissible purpose of indicating that HGN evidence was scientific evidence proving intoxication or impairment).[4]

Recently, in *State v. Doriguzzi,* 334 N.J.Super. 530, 760 A.2d 336 (2000), the court held that HGN evidence is scientific evidence that must be shown to meet a reliability standard before it may be admitted. The court specifically declined to take judicial notice of the reliability of HGN evidence, holding that a survey of the relevant decisions did not provide the court with the level of certainty to generally approve of the admission of HGN evidence in future cases. The *Doriguzzi* court stated:

> We emphasize that what is being sought here by the State is admission of HGN testing as an element of proof to permit the factfinder to conclude that failure of the HGN test, in combination with the failure of coordination tests, sufficiently proves defendant's guilt of driving under the influence of alcohol.  * * * We note a recurrent theme in the decisions from other jurisdictions that a jury may be inappropriately influenced by the apparent scientific precision of HGN testing or otherwise fail to properly understand it.

In *U.S. v. Horn, supra,* the court held that while a police officer trained in observing nystagmus could testify to the officer's observation of exaggerated nystagmus,[5] the officer could not testify to the significance of the nystagmus. The officer could not, without stepping outside the bounds of permissible non-scientific testimony, call HGN evidence a "test," could not say that the person "failed," and could not say that the observed nystagmus was a "clue" or "sign"of intoxication. 185 F.Supp.2d at 561.

The court in *U.S. v. Horn* held that evidence as to any significance that might be given to factually established exaggerated nystagmus in a given case must come from either judicial notice of scientific facts, from case-specific testimony by expert witnesses, or from learned treatises and recognized scientific studies relating to nystagmus and intoxication. Because of a lack of such evidence in the *U.S. v. Horn* case, including a lack of persuasive independent scientific studies in the record showing the reliability of HGN evidence (and the record in *Horn* was extremely well developed in this area), the court in *Horn* declined to take judicial

---

**4.** *See also Williams v. State,* 710 So.2d 24, 43 (Fla.App.1998) (Cope, J., concurring and dissenting) (discussing how in a double-blind experiment in 1996, the examiner's opinions using HGN evaluations and other non-invasive sobriety tests were consistent with chemical test results 44% of the time in alcohol-only cases, and 56% of the time in drug and alcohol cases; stating that HGN evaluation was designed to be one of several field sobriety evaluation procedures to be conducted at roadside to aid an officer in deciding whether he has probable cause to believe that the driver is guilty of driving under the influence).

**5.** "Exaggerated" nystagmus means nystagmus in excess of "normal" nystagmus. *U.S. v. Horn,* 185 F.Supp.2d at 537. This distinction illustrates the subjectivity of the minute observations inherent in HGN evaluation.

notice of the scientific reliability of exaggerated HGN as a reliable indicator of intoxication. 185 F.Supp.2d at 557. I believe that the court in *U.S. v. Horn* was entirely correct in not taking judicial notice of the reliability of HGN evidence, based on the current state of scientific research, as comprehensively discussed in the court's opinion.[6]

This Court has discussed HGN evidence in several cases since *Barker* was decided. In *Boley v. Cline*, 193 W.Va. 311, 314, 456 S.E.2d 38, 41 (1995) *(per curiam )*, we upheld a driver's license revocation that was based on evidence of erratic driving, the smell of alcohol on the driver's breath, and HGN in one eye. Former Justice Cleckley concurred in *Boley*, indicating that he believed the evidence may have been insufficient to prove intoxication, even under a preponderance standard. 193 W.Va. at 315, 456 S.E.2d at 42. In *Dean v. W.Va. D.M.V.*, 195 W.Va. 70, 464 S.E.2d 589 (1995), we also upheld a license suspension that was based in part on HGN evidence. In both *Dean* and *Boley*, there was apparently no specific challenge to the admissibility of HGN evidence based on a lack of expert testimony regarding its reliability as evidence of intoxication; in both cases we assumed that it was admissible for that purpose.

In *Muscatell v. Cline*, 196 W.Va. 588, 595, 474 S.E.2d 518, 525 (1996), we upheld a DUI conviction where there was a challenge to HGN evidence on the grounds that there had been no expert evidence to establish the scientific reliability of the HGN evidence. We said in *Muscatell* that the trial court was wrong in reading *Barker* to require such expert evidence. 196 W.Va. at 595, 474 S.E.2d at 525. However, as shown in the foregoing-quoted excerpt from *Barker*, although the holding was not set forth in a syllabus point, *Barker required an expert showing of the scientific reliability of HGN evidence before such evidence could be found to be admissible on the issue of intoxication.* The Court's opinion in *Muscatell*, which primarily focused on a separate issue, simply misread *Barker*.

In two other cases, *Cunningham v. Bechtold*, 186 W.Va. 474, 413 S.E.2d 129 (1991), and *State v. Davis*, 195 W.Va. 79, 464 S.E.2d 598 (1995), we upheld the use of HGN evidence for the limited purpose that the HGN evaluation was designed to be used, to-wit: to provide a basis for police officers in deciding whether they have probable cause to make an arrest.

In most DUI cases, the prosecution (or the motor vehicle commissioner in a driver's license case), in addition to such evidence as erratic driving, odor of alcohol, performance on non-HGN field sobriety tests, consumption of alcohol, etc., has presumptively admissible scientific evidence to support the charge, in the form of breathalyzer machine results showing a person's blood alcohol level. The state-approved protocols for the use of such machines are designed to create scientifically reliable results, and are established by state agencies that are not in the business of prosecuting cases. The breathalyzer machine results are objective, and appear to be accepted by every jurisdiction as scientifically reliable and presumptively admissible if properly performed. Therefore, our courts allow a witness who does not understand in detail how and why the machines actually work to testify to their results as evidence of a person's blood alcohol level.

HGN evidence, however, as demonstrated hereinabove, is not objective. HGN observation and evaluation relies entirely on a brief, subjective observation of transitory phenom-

---

**6.** While I do not necessarily agree with all of the court's approach and conclusions in *U.S. v. Horn*, and while the somewhat elaborate procedural approach to HGN evidence that the court in *U.S. v. Horn* ultimately prescribes may be unnecessarily complex, the opinion's breadth and thoroughness should be a benchmark for future jurisprudence in this area. The opinion is particularly noteworthy in three areas. First, the opinion comprehensively reviews all of the scientific studies of HGN evidence, and points out their strengths and their notable shortcomings. Second, the opinion comprehensively reviews the approaches to HGN evidence taken by all of the states, and from them, derives a well-reasoned approach that draws from the best work of those courts. Third, the opinion's approach properly leaves the door open for more science to develop in this area, without prejudicing the rights of the State or individuals. All in all, the opinion in *U.S. v. Horn* is a remarkable example of a court performing its unique, independent, and vital function in a democracy.

ena by a non-scientist, under field conditions that are ordinarily distracting and stressful. There is a high level of controversy as to the reliability of HGN evidence to prove intoxication, with many jurisdictions firmly rejecting the suggestion that HGN evidence be accepted as a standard, generally accepted, and presumptively admissible *indicium* of intoxication that may be presented to a factfinder as such without independent expert testimony showing the scientific reliability of such evidence in a given case.

While some jurisdictions have concluded that HGN evidence is reliable and presumptively admissible to show intoxication without a showing of the scientific reliability of the evidence for that purpose in a given case, *see, e.g., State v. O'Key,* 321 Or. 285, 899 P.2d 663 (1995), the majority of courts have taken the approach that we took in *State v. Barker, supra. See, e.g., Horn, Young, and Doriguzzi, supra. See generally, Unreliability of the Horizontal Gaze Nystagmus Test,* 4 Am.Jur. Proof of Facts 439; *Horizontal Gaze Nystagmus Test: Use in Impaired Driving Prosecution,* 60 A.L.R.4th 1129; *Can Your Eyes Be Used Against You? The Use of the Horizontal Gaze Nystagmus Test in the Courtroom,* 84 Journal of Criminal Law and Criminology 203 (1993).

As the previous discussion indicates, the areas of potential scientific weakness and unreliability with respect to HGN evidence are numerous. For example, many conditions other than alcohol consumption can cause nystagmus—and apparently many people have nystagmus naturally. It also appears that alcohol-related nystagmus can persist for hours after blood alcohol level declines to zero. The court in *Horn* noted that while there is little dispute that exaggerated nystagmus is caused by the *consumption* of alcohol (and other conditions), 185 F.Supp.2d at 555, proof of the consumption of alcohol is not the same thing as proof of intoxication. Another example of HGN evidence's unreliability is shown by one reported study where, under controlled conditions, double-blind evaluations of intoxication based on HGN evidence and similar non-invasive sobriety tests were *no better than chance. See Williams v. State, supra,* 710 So.2d at 43.

Of course, it may be argued that these are the sorts of weaknesses in HGN evidence that a defense lawyer can bring out in cross-examination. But ordinarily, as in the instant case, the testifying witness, a police officer, knows little or nothing one way or another about these scientific issues. No matter how knowledgeable and incisive a defense lawyer may be regarding the potential for errors in HGN evidence, if the testifying officer simply and truthfully says, "I don't know anything about 'natural nystagmus' or any of those other areas; I simply perform the test and draw the conclusions about intoxication as I was taught to"—then even the best cross-examination cannot get much traction, and will not go very far to impeach the officer's testimony. The prosecution or commissioner will point out that the officer properly administered a "scientific test;" and a fact-finder will be inclined to accept the results, particularly without expert evidence to the contrary. *See Young, supra,* 693 So.2d at 1360.

As Justice Davis reiterated in a recent opinion, *State v. Leep,* 212 W.Va. 57, ——, 569 S.E.2d 133, 147 (2002), "[o]ne of the dangers inherent in expert testimony in regard to scientific tests is that the jury may not understand the exact nature of the test and the particular methodology of the test procedure and accord an undue significance to the expert testimony." (*quoting State v. Clawson,* 165 W.Va. 588, 621, 270 S.E.2d 659, 678 (1980).)

In this regard, it must be recognized that thousands of West Virginians are criminally and civilly prosecuted for DUI each year; and most of them are of modest means. Some do not have lawyers, and even if they do, the vast majority of accused drivers cannot afford scientific experts to challenge HGN evidence of intoxication presented by police officers who are in good faith merely repeating what they have been taught about that evidence. Under these conditions, where liberty and valuable property interests are at stake, our legal system has a particularly strong "basic fairness" obligation to see that the evidence that is regularly used by the State in these proceedings, where most

defenses must necessarily be limited in time and cost, meets a threshold of well-established scientific reliability.[7] HGN evidence simply does not meet that test.[8]

Based on all of the foregoing discussion, in accord with the well-reasoned decisions of many courts, and as required by our prior holding in *Barker, supra,* it is clear that evidence of horizontal gaze nystagmus ("HGN") is not admissible in a civil or criminal proceeding to show that a person drove a motor vehicle under the influence of alcohol, controlled substances, or drugs in violation of *W.Va.Code,* 17C–5–2 [2001] unless there is specific proof using expert testimony of the scientific reliability of the HGN evidence in the particular case to make such a showing. The training of a police officer to perform HGN observations and evaluations does not provide the officer with the expert qualifications to establish HGN evidence's scientific reliability. *See State v. Barker,* 179 W.Va.

194, 366 S.E.2d 642 (1988). To the extent that this principle conflicts with language in this Court's opinions in *Boley v. Cline,* 193 W.Va. 311, 456 S.E.2d 38 (1995) (*per curiam*); *Dean v. W.Va. DMV,* 195 W.Va. 70, 464 S.E.2d 589 (1995); *Muscatell v. Cline,* 196 W.Va. 588, 474 S.E.2d 518 (1996)—and the instant case—those cases erroneously state the law.

Horizontal gaze nystagmus ("HGN") observations may be relied upon by a law enforcement officer in deciding whether there is probable cause to believe that a person is intoxicated. If the officer's basis for believing that there was probable cause is challenged, and the officer has been trained in observing and evaluating HGN, evidence regarding HGN observations (if otherwise admissible), may only be admitted for the purpose of showing probable cause, without a separate showing of the HGN evidence's reliability.[9]

7. This is not the place to discuss the various approaches or standards that are evolving for courts considering scientific, technical, expert, opinion, or other such evidence. Some would say that the more recent *Daubert/Wilt* "relevant and reliable" approach to scientific evidence is more liberal than the earlier *Frye* "generally accepted" approach. *See* Davis, Justice Robin Jean, *et al.,* "An Analysis of the Development of Admitting Expert Testimony in Federal Courts and the Impact of That Development on West Virginia Jurisprudence," ___ *W.Va.L.Rev.* ___ (200__) (forthcoming). Regardless of the formulation of the approach or standard used, constitutional due process clearly requires courts to take a hard look at the admissibility of scientific test evidence that is regularly used against citizens in criminal and administrative cases by the State, and that is presented by witnesses who do not understand the underlying science. The constitutional necessity for such a "hard look" at scientific, etc. evidence is not so compellingly presented when equally matched civil litigants are presenting a battle of "duelling experts." In the latter case, cross-examination and jury weight and credibility determinations can address issues of reliability more effectively and fairly than in the former case.

8. Courts are generally in accord that non-HGN "field sobriety test" evidence, such as a person's performance of tasks like walk-and-turn, one-legged stand, etc., is not scientific evidence and is admissible on the issue of intoxication without expert testimony as to its reliability—because, like other lay observation evidence like slurred speech, emotional lability, etc., such evidence draws for its persuasive force on the common understanding of lay persons of the effects of

intoxication on human behavior. In *State v. Ferrer,* 95 Hawai'i 409, 23 P.3d 744 (2001), the court stated:

It is generally recognized, however, that the foundational requirements for admission of psychomotor FST [field sobriety test] evidence differ from the foundational requirements for admission of HGN evidence. Psychomotor FSTs test balance and divided attention, or the ability to perform multiple tasks simultaneously. While balancing is not necessarily a factor in driving, the lack of balance is an indicator that there may be other problems. Poor divided attention skills relate directly to a driver's exercise of judgment and ability to respond to the numerous stimuli presented during driving. The tests involving coordination (including the walk-and-turn and the one-leg-stand) are probative of the ability to drive, as they examine control over the subject's own movements. Because evidence procured by administration of psychomotor FSTs is within the common experience of the ordinary citizen, the majority of courts that have addressed the issue generally consider psychomotor FSTs to be nonscientific evidence.

9. The State may of course put on expert testimony in a given case to seek to establish the reliability of HGN evidence in that case. That circumstance would present the questions for the tribunal: first, whether to admit the HGN evidence; and second, if the evidence is admitted, whether and how much to credit the evidence. Police officers and prosecutors presenting evidence in DUI cases place the results of those cases in jeopardy if they do not comply with the requirements of *Barker.*

I am authorized to state that Justice AL-BRIGHT joins in this separate opinion, and concurs specially with the comments herein discussing *Muscatell, supra,* an opinion of this Court that he authored.