IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2025 Term

_____

No. 22-901

_____

FILED

May 14, 2025
released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

Scott Michael Andrew Hundley,
Defendant Below, Petitioner

_____

Appeal from the Circuit Court of Jefferson County
The Honorable Debra McLaughlin, Judge
Case No. 22-F-16

AFFIRMED

_____

Submitted: February 18, 2025
Filed:  May 14, 2025

Shawn McDermott, Esq.
Kevin D. Mills, Esq.
Criminal Law Center
Martinsburg, West Virginia
Counsel for Petitioner

John B. McCuskey, Esq.
Attorney General
Andrea Nease Proper, Esq.
Deputy Attorney General
Charleston, West Virginia
Counsel for Respondent

JUSTICE WALKER delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard."  Syllabus Point 4, *State v. Rodoussakis,* 204 W. Va. 58, 511 S.E.2d 469 (1998).

2.      "This Court will not consider an error which is not preserved in the record nor apparent on the face of the record."  Syllabus Point 6, *State v. Byers*, 159 W. Va. 596, 224 S.E.2d 726 (1976).

3.      "Where the record of a criminal trial shows that the cumulative effect of numerous errors committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing alone would be harmless error."  Syllabus Point 5, *State v. Smith*, 156 W. Va. 385, 193 S.E.2d 550 (1972).

WALKER, Justice:

Petitioner Scott Michael Andrew Hundley was convicted of second-degree murder after he fatally stabbed Thomas Cekada Jr. in 2021. On appeal, Mr. Hundley's primary argument is that evidence of the victim's use and sale of drugs should have been admitted in support of his self-defense theory. He also argues that the court erred in allowing the State's rebuttal to exceed the scope of its initial closing argument, and raises error related to various evidentiary rulings and alleged prosecutorial misconduct. In short, we find no abuse of discretion with respect to the circuit court's evidentiary and other rulings, and note that the court appropriately identified a path for Mr. Hundley to seek the admission of evidence of the victim's drug use that he chose not to take. Finding no error, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Indictment and Underlying Facts

Mr. Hundley was indicted on one count of first-degree murder by the Jefferson County Grand Jury after he fatally stabbed Thomas Cekada Jr. in the neck on August 7, 2021. Earlier that day, Mr. Hundley was exiting the Dollar General in Charles Town and observed Mr. Cekada parked outside. According to Mr. Hundley, Mr. Cekada brandished a firearm at him from inside of his vehicle. Shortly following the incident at the Dollar General, Mr. Hundley and Mr. Cekada were involved in a motor vehicle collision on Mountain Mission Road. Mr. Hundley exited his vehicle to assess the damage and only

1

then noticed that the other driver was Mr. Cekada. According to Mr. Hundley, Mr. Cekada once again brandished a firearm in his direction, so, fearing for his life, he stabbed Mr. Cekada in the neck before fleeing the scene.

When officers apprehended Mr. Hundley that evening at the home of Roger and Rosanna Piper, the maternal grandparents of Mr. Hundley's children, Chief Deputy Victor Lupis inquired about the incident and Mr. Hundley responded that he may need an attorney. Questioning ceased before the officers placed Mr. Hundley under arrest and brought Mr. Hundley to the Jefferson County Sherriff's Department, where he was advised of his *Miranda*[1] rights, signed a waiver, and gave a statement that he had stabbed Mr. Cekada in self-defense after Mr. Cekada had twice brandished a firearm at him.

## B. Pre-Trial Hearing

Before trial, Mr. Hundley filed a motion to suppress his statements made to law enforcement, claiming that the statements were inadmissible because he had made an unequivocal request for counsel to Chief Deputy Lupis when he was apprehended at the home of Mr. and Mrs. Piper. The State filed a pre-trial motion seeking to prohibit the admission of evidence pertaining to Mr. Cekada's drug activity, including a toxicology report showing the presence of several controlled substances in Mr. Cekada's system at the time of his death and text message records from Mr. Cekada's cell phone. The State also

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

filed a notice of intent to introduce evidence under Rule 404(b) of the West Virginia Rules of Evidence that Mr. Hundley had been convicted of stabbing his stepfather in 2016.

At the pretrial hearing on April 28, 2022, the circuit court first addressed Mr. Hundley's motion to suppress the statements he made to law enforcement officers after he was placed under arrest. The court indicated that it had viewed a recording of the statement from footage obtained from Chief Deputy Lupis's body camera. Based on the inflection of Mr. Hundley's voice in the recording, the court determined that the statement was equivocal and did not qualify as a request for counsel. The court further noted that Mr. Hundley was not in custody at the time that he made the statement based on his demeanor and the timing of his interaction with Chief Deputy Lupis, and thus, *Miranda* had not yet been triggered. Once Mr. Hundley was placed under arrest, he was properly advised of, but affirmatively waived those rights and spoke with the officers. So, the court determined that his statement to law enforcement officers was admissible.

The court then considered the State's pre-trial motion to suppress evidence related to Mr. Cekada's drug use. Mr. Hundley argued that toxicology results showing several drugs in Mr. Cekada's system at the time of his death were relevant to his claim that Mr. Cekada was "displaying irrational behavior consistent with drug use" at the time of the stabbing and, along with evidence of Mr. Cekada's erratic driving, supported his claim that the stabbing was in self-defense. The court noted that Mr. Hundley had failed to identify a link between the drugs found in Mr. Cekada's system and his alleged irrational

3

behaviors, and determined that the evidence of drug use, in and of itself, was not relevant without expert testimony that the substances could cause irrational behavior. In granting the State's motion, the court instructed Mr. Hundley that it would consider granting a continuance to reconsider its decision if Mr. Hundley procured testimony from an expert toxicologist. Mr. Hundley acknowledged the court's instruction and responded, "I need to do that." As for text message evidence purporting to show drug transactions, Mr. Hundley did not object to the State's motion to the extent that suppression of the text messages did not preclude him from presenting testimony related to Mr. Cekada's drug use.

Last, the court conducted a hearing pursuant to *State v. McGinnis*,[2] to address the State's request to introduce Rule 404(b) evidence that Mr. Hundley had previously stabbed another individual and pleaded guilty to unlawful wounding and domestic battery. The State called Corporal Conor O'Shea, who testified that he responded to a call regarding an assault in progress in 2016. At the scene, Mr. Hundley's mother advised Corporal O'Shea that Mr. Hundley had attacked her and her boyfriend, Timothy Williamson, and had stabbed Mr. Williamson during the altercation. Corporal O'Shea testified that Mr. Hundley had eventually pled guilty to unlawful wounding and domestic battery. In response, Mr. Hundley called Mr. Williamson to the stand. Mr. Williamson testified that he had instigated the argument with Mr. Hundley and had struck Mr. Hundley with a weapon before Mr. Hundley stabbed him. Mr. Williamson further explained that he

---

[2] 193 W. Va. 147, 455 S.E.2d 516 (1994).

4

informed Corporal O'Shea that night that the altercation was "a mutual affray" and that he did not want to press charges. The court then denied the State's request to use this evidence under Rule 404(b). Several days after the pre-trial hearing, the State filed an information charging Mr. Williamson with one misdemeanor count of false swearing. The State alleged that Mr. Williamson "testified [at the *McGinnis* hearing] in direct contravention to several points of his written statement [previously given to Corporal O'Shea in 2016] in an effort to have the evidence of the prior stabbing excluded from the pending murder case."

## C.    Evidence at Trial

Mr. Hundley's jury trial began on May 18, 2022. The State called Deputy William Willhelm, the Jefferson County deputy sheriff who responded to the scene of Mr. Cekada's stabbing. Deputy Willhelm explained that when he arrived at the scene, he observed Mr. Cekada on his knees bleeding heavily and holding his neck. He told the jury that as soon as he approached Mr. Cekada, Mr. Cekada stated, "Scott Hundley did this to me[,]" before losing consciousness. Deputy Willhelm further testified that he removed a firearm from Mr. Cekada's front right pocket. Deputy Willhelm explained that there were no live rounds in the chamber of the firearm but that there were six rounds in the magazine. Last, he explained that although any blood on the firearm appeared to have solely been transferred from Mr. Cekada's clothing, Mr. Cekada's hands were covered in blood at the time of his death.

The State next called two witnesses who had observed portions of the incident. Dana Clutter-White testified that she observed a red Ford Escape—later confirmed to be Mr. Cekada's vehicle—driving over the speed limit and on Mountain Mission Road. Shortly after that, she observed Mr. Cekada's vehicle parked behind an older beige truck, which was later confirmed to be Mr. Hundley's vehicle. She told the court that she noticed Mr. Hundley briskly walking away from the driver's side door of Mr. Cekada's vehicle, before Mr. Cekada threw his vehicle into reverse, and almost sideswiped her vehicle. She testified that when she looked into the window of Mr. Cekada's vehicle, Mr. Cekada appeared sick and scared, and at least one of his hands was on the steering wheel. Christy Maddox testified that on the day of the incident, she noticed the same red Ford Escape driving erratically behind her at an "unbelievably high speed." She explained that the next time she saw Mr. Cekada's vehicle, Mr. Cekada had made a U-turn into her vehicle, causing an accident. She said that she next observed Mr. Cekada exiting his car, drenched in blood and holding his neck. Ms. Maddox remained in her vehicle until officers arrived at the scene.

The court then heard testimony from Lieutenant Robert Sell, an accident reconstructionist with the Jefferson County Sherriff's Department. Lieutenant Sell was qualified as an expert in accident reconstruction. He told the court that he assessed the accident between Mr. Cekada and Ms. Maddox. He explained that based on the damage to the front of Mr. Cekada's vehicle, he could not determine whether it had been in an accident with Mr. Hundley's vehicle prior to the collision with Ms. Maddox. He further explained

that Mr. Hundley's vehicle, which he examined at the impound lot, did not have red paint on it or any other signs of a collision Mr. Cekada's vehicle.[3]

Officer Holz next testified that over the course of his investigation, he reviewed Mr. Hundley's description of the incident during a phone call he made from the jail the day after the stabbing to Ms. Piper. The State moved to publish the recorded call, and the recording was played for the jury. After the recorded phone call was played for the jury, Mr. Hundley asked the court for a sidebar and the jury was excused from the courtroom. Mr. Hundley argued that because the last portion of the recorded phone call included a statement from Ms. Piper to Mr. Hundley suggesting that the stabbing was in self-defense, the State, in essence, introduced evidence suggesting that Mr. Hundley's self-defense argument was fabricated after the stabbing. So, Mr. Hundley argued, he should be permitted to introduce Mr. Hundley's prior statement to law enforcement officers that he had stabbed Mr. Cekada out of fear for his safety. The court determined that Mr. Hundley could ask Officer Holz whether Ms. Piper's assertion that the stabbing was self-defense was consistent with Mr. Hundley's earlier statements, but that the statement in and of itself could not be introduced unless Mr. Hundley took the stand to testify. Following the sidebar, the court adjourned.

---

[3] Chief Deputy Lupis similarly testified that he observed a black scuff mark on the bumper of Mr. Hundley's vehicle but did not observe any dents or other damage on the back of his vehicle.

The following day, the court reconvened, and Officer Holz was called again to testify. Mr. Hundley asked whether "the contents of the phone call [played to the jury the day before] were substantially the same as what Mr. Hundley provided in his [initial statement to officers]." Officer Holz replied "Yes, sir, for the most part."

After Officer Holz finished testifying, the State called Ms. Piper, who testified that Mr. Hundley had placed a phone call to her after the incident with Mr. Cekada at the Dollar General and before the altercation with Mr. Cekada on Mountain Mission Road. She explained that during the phone call, Mr. Hundley told her that Mr. Cekada had "pulled his gun on him" at the Dollar General and that he was "going to fucking kill [Mr. Cekada]" because he had brandished the firearm at him. She then explained during cross examination by Mr. Hundley that Mr. Cekada frequently visited Mr. and Ms. Piper's home, and that Mr. Piper no longer wanted Mr. Cekada to visit the home because Mr. Cekada used drugs with their son Andrew Piper. She explained that in the weeks before the incident, Mr. Hundley overheard Mr. Piper tell her that Mr. Cekada was no longer welcome in the home, and that Mr. Hundley had then relayed to Mr. Cekada that he was not permitted to visit Mr. and Ms. Piper's home. Ms. Piper also testified that although Mr. Cekada used drugs with Andrew Piper, he did not sell drugs to Andrew Piper.

The State then called David Boober, a former investigator with the West Virginia State Police. Mr. Boober was qualified by the court as an expert in digital forensics. On cross examination, Mr. Hundley attempted to ask Mr. Boober about text

8

messages on Mr. Cekada's phone allegedly indicating that Mr. Cekada sold drugs. The State objected to the admission of the text messages, and the court held a sidebar. Mr. Hundley argued that the text messages were relevant to refute the State's assertion that Mr. Cekada's firearm was in his pocket at the time of the stabbing, since drug dealers "carry guns all the time." The court ruled that the fact of whether or not Mr. Cekada sells drugs would not make it any more likely or less likely that he brandished the firearm at Mr. Hundley and sustained the State's objection to the admission of the text message evidence.

The court then heard testimony from the forensic pathologist who performed Mr. Cekada's autopsy, Dr. Ashton Ennis. Dr. Ennis was recognized as an expert in the area of forensic pathology. Relevant to this appeal, Mr. Hundley lodged an objection to the State's attempt to admit photographs taken during the autopsy of Mr. Cekada's hands, covered in blood. The State argued that the photographs were relevant to support its theory that Mr. Cekada did not brandish the firearm at Mr. Hundley because Mr. Cekada's hands were bloody, and the firearm found in his pocket was not. The court determined that the photographs were only relevant for the limited purpose of corroborating Ms. Maddox's earlier testimony that Mr. Cekada had his hands wrapped around his throat when he approached her. Ultimately, Dr. Ennis testified that Mr. Cekada's hands were, as shown in the admitted photographs, bloody before they were cleaned during the autopsy.

After the State rested, Mr. Hundley moved for a directed verdict. He asserted that the State failed to show premeditation because the exchange between Mr. Hundley and

9

Mr. Cekada lasted "10 seconds, maybe 20 seconds." So, Mr. Hundley argued, at best, the State had only proven second-degree murder. The circuit court ruled that the State had presented sufficient evidence for the jury to determine whether the stabbing was premeditated because the State presented evidence that Mr. Hundley had made a statement threatening to kill Mr. Cekada before the stabbing occurred. The court then took a recess before the defense presented its case.

Mr. Hundley first called Mr. Piper to testify. Mr. Piper explained that although Mr. Hundley overheard Mr. Piper expressing his opinion that Mr. Cekada was no longer welcome in the home to Ms. Piper, he had never directed Mr. Hundley to relay that opinion to Mr. Cekada.

Mr. Hundley then testified, explaining that his relationship with Mr. Cekada became strained after Mr. Hundley told Mr. Cekada he was no longer welcome at the Piper residence around July 27, 2021. He testified that he knew Andrew Piper and Mr. Cekada used drugs together because he observed burnt up foil indicative of drug use around the downstairs bathroom of the Piper residence. He explained that he became concerned about the drug use after Mr. Cekada began to behave erratically around the children.

Regarding the altercation, Mr. Hundley testified that on August 7, he stopped at a Dollar General after purchasing a gift for his nephew to buy a gift bag and a present for his daughter. He explained that he encountered Mr. Cekada's car toward the back end

10

of the parking lot and pointed toward the exit. When he made eye contact with Mr. Cekada, Mr. Cekada brandished a firearm at him in a circular motion. Mr. Hundley further explained that he then approached Mr. Cekada's vehicle and yelled "[w]hat the hell are you doing? What are you trying to do?" At that point, Mr. Cekada drove off, so Mr. Hundley returned to his car. Mr. Hundley told the court that following this altercation, he left the Dollar General and began driving up Mountain Mission Road to his nephew's birthday party. As he drove up Mountain Mission Road, he made a phone call to Ms. Piper threatening to kill Mr. Cekada. He explained that although he told Ms. Piper he was going to kill Mr. Cekada, that he did not mean it, and that it was only an expression. He testified that almost immediately after he got off the phone with Ms. Piper, another vehicle rear-ended him. Mr. Hundley then explained that he exited his car to check for damage, and only then noticed Mr. Cekada outside the vehicle and pointing a firearm directly at his face, just a few feet away. He explained that at that point, he panicked and reached for his pocketknife to stab Mr. Cekada. He testified that he felt like his life was in danger before he stabbed Mr. Cekada. He explained that after the stabbing, he panicked and threw the knife.

### D.    Closing Arguments and Sentencing

Before closing arguments, the State sought clarification of whether it would be permitted to argue a lack of self-defense based on Mr. Cekada's bloody hands and the lack of blood on his gun. The court determined that the State was permitted to argue the

11

lack of blood on the firearm, and Mr. Hundley did not object. Even so, the State made no references to the lack of blood on the firearm during its initial closing argument. But after Mr. Hundley presented a self-defense argument in his closing argument, the State argued in its rebuttal that self-defense did not apply because there was no blood on the firearm at the time it was retrieved from Mr. Cekada's body, even though his hands were covered in blood. Mr. Hundley lodged an objection to this line of argument, but the court determined that the State's argument directly rebutted Mr. Hundley's self-defense claim.

After several hours of deliberation, the jury found Mr. Hundley guilty of the lesser-included offense of second-degree murder. Mr. Hundley filed several post-trial motions, which were denied, and the court sentenced him to a determinate term of forty years of imprisonment. Mr. Hundley received a recidivist enhancement of an additional five years, for an aggregate sentence of forty-five years. He now appeals that order.

## II.    STANDARD OF REVIEW

As for Mr. Hundley's objections to the circuit court's evidentiary rulings, "[a] trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard."[4] To the extent that he asserts that the State wrongfully withheld exculpatory evidence, because claims under *Brady v.*

---

[4] Syl. Pt. 4, *State v. Rodoussakis*, 204 W. Va. 58, 511 S.E.2d 469 (1998).

*Maryland*[5] involve "mixed questions of law and fact," this Court's standard of review dictates that the "circuit court's factual findings should be reviewed under a clearly erroneous standard . . . and questions of law are subject to de novo review."[6] With regard to his challenge to the circuit court's control of closing arguments, this Court has held that "a trial court has broad discretion in controlling argument before the jury and that counsel should be afforded wide latitude in presenting a case."[7] Last, to Mr. Hundley's contention that the circuit court incorrectly allowed the admission of his statements to police, "[w]e apply an abuse of discretion standard of review to a circuit court's decision on the admissibility of a confession."[8] With these standards in mind, we proceed to the merits of this appeal.

## III. ANALYSIS

We consider Mr. Hundley's assignments of error on appeal in turn. First, we take up whether Mr. Cekada's use and sale of drugs should have been admitted in support of Mr. Hundley's self-defense theory. We next consider whether the court erred in allowing the State's rebuttal to exceed the scope of its initial closing argument. His claims related to prosecutorial misconduct and the State's failure to disclose exculpatory evidence are

---

[5] 373 U.S. 83 (1963).

[6] *State v. Youngblood*, 221 W. Va. 20, 26, 650 S.E.2d 119, 125 (2007) (citation and internal quotation marks omitted).

[7] *Dawson v. Casey*, 178 W. Va. 717, 721, 364 S.E.2d 43, 47 (1987).

[8] *State v. Campbell*, 246 W. Va. 230, 237, 868 S.E.2d 444, 451 (2022).

13

then discussed. Finally, we examine Mr. Hundley's challenges to the circuit court's evidentiary rulings with regard to statements he made to police, and cumulative error.

## A.    Evidence of Mr. Cekada's Drug Use

Mr. Hundley first challenges the circuit court's decision to prohibit the admission of certain evidence related to Mr. Cekada's drug use, which he contends supported his claim of self-defense and was relevant to show that Mr. Cekada was behaving in an erratic and threatening manner, putting Mr. Hundley in fear of his life at the time that he stabbed Mr. Cekada. Specifically, Mr. Hundley challenges the circuit court's pre-trial ruling that the toxicology report was inadmissible and the court's later ruling that text messages evincing Mr. Cekada's drug transactions could not be introduced during the trial. The State responds that Mr. Hundley "has failed to demonstrate how the circuit court abused its discretion by prohibiting him from introducing evidence regarding Mr. Cekada's drug activities[,]" because, according to the State, the presence of controlled substances in one's system, alone, does not prove that a person is intoxicated.[9]

Evidence is relevant when "(a) it has a tendency to make a fact more or less probable than it would without the evidence; and (b) the fact is of consequence in

---

[9] To support this argument the State cites Justice Starcher's concurring opinion in *State v. Dilliner*, 212 W. Va. 135, 569 S.E.2d 211 (2002). There, Justice Starcher noted that "proof of the consumption of alcohol is not the same thing as proof of intoxication." *Id*. at 147, 569 S.E.2d at 223.

14

determining the action."[10] The circuit court determined that the toxicology report was not relevant to any fact at issue without, at least, potential testimony from an expert regarding the effect of the substances. We agree. On its face, the toxicology report merely demonstrated the presence of various substances in Mr. Cekada's system at the time of his death. Without related expert testimony or other evidence to explain those results to the jury, several potential questions remain, including: (1) how long the relevant substances could have remained in Mr. Cekada's system in light of his individual metabolism, age, and mass, (2) how the various substances may or may not have interacted with each other, (3) the impacts of the various substances present in the toxicology report at the specific levels that they presented in Mr. Cekada's system, and (4) the behavioral impacts of such substances given all of these considerations.

We have held that "when the issues are beyond the common knowledge and experience of the average juror, expert testimony shall be required."[11] Because the average juror is not equipped to interpret and understand these considerations, the toxicology results had no tendency to make any facts about Mr. Cekada's behavioral characteristics more or less probable. So, the court did not err when it determined that the toxicology screen did not, without expert testimony, pass muster under Rule 401's evidentiary standard.

---

[10] W. Va. R. Evid. 401.

[11] *J.C. by and through Michelle C. v. Pfizer, Inc.*, 240 W. Va. 571, 583, 814 S.E.2d 234, 246 (2018).

Mr. Hundley cites several cases from other jurisdictions, which he claims support his contention that the circuit court erred in its decision to exclude the toxicology report. A close analysis indicates otherwise. First, Mr. Hundley relies on *Newell v. State*,[12] where the Mississippi Supreme Court found that a trial court's exclusion of the victim's toxicology results constituted an abuse of discretion.[13] Critically, in *Newell*, the court found that the relevance of the toxicology result had already been established because evidence of the victim's allegedly aggressive and violent behavior had been shown through testimony by witnesses present during the shooting.[14] More to the point, there, unlike here, the defendant attempted to introduce the testimony through an expert toxicologist.[15] In this case, the circuit court carefully considered the fact that Mr. Hundley could not present any evidence "other than the [erratic] driving," to show that Mr. Cekada "was impaired at the time [of the incident]." So, the toxicology screen's relevance had not been established at the time of the court's ruling.

Noting that the drugs could remain in Mr. Cekada's system long after ingestion, and that someone can screen positive for substances without exhibiting signs of impairment (in this case, erratic behavior), the court determined that the toxicology screen

---

[12] 49 So.3d 66 (Miss. 2010).

[13] *Id.* at 73.

[14] *Id.*

[15] *Id.*

16

was, at that time, inadmissible. But the court also clearly noted that it would reconsider the motion if Mr. Hundley became aware of any evidence during the course of the trial that may make the toxicology screen relevant. The court specifically informed Mr. Hundley that he may be able to establish the relevance of the toxicology results through the testimony of an expert toxicologist who could explain the effect of the drugs on human behavior. The court further indicated that it may consider continuing the case if Mr. Hundley obtained expert testimony to that effect, but Mr. Hundley never did that.

The circuit court's ruling—essentially, that the evidence was irrelevant without an expert to interpret the toxicology results—is consistent with several other cases cited by Mr. Hundley. For instance, in *State v. David*,[16] the Hawaii Supreme Court concluded that defense expert testimony was not necessary to admit the victim's .225 blood alcohol content.[17] But this is because "[c]ourts have long recognized that alcohol's effects such as violence are within jurors' common understanding[,]"[18] and that "[t]he temporal and individual variations of alcohol's impact are similarly within jurors common understanding[.]"[19] The same cannot be said for the behavioral effects of drugs, however,

---

[16] 494 P.3d 1202 (Hawaii 2021).

[17] *Id*. at 1209.

[18] *Id*. (internal citations omitted).

[19] *Id.*

17

as those effects are not, generally, thought to be within a juror's common knowledge.[20]  So, "some jurisdictions have specially held that a more trained or experienced observer is necessary to testify as to the intoxicating effects of drugs"[21]  Here, the circuit court did not, as Mr. Hundley suggests, preclude him from introducing evidence of the toxicology screen without reservation.  Instead, the court noted that the toxicology screen was not, on its own, relevant, and provided an opportunity for Mr. Hundley to supplement his relevance argument if a toxicologist could, essentially, explain a reason that the results were relevant. We find this determination is squarely in line with Rule 401's evidentiary standard, that evidence is relevant only when "it has a tendency to make a fact more or less probable than it would without the evidence" and when "the fact is of consequence in determining the action,"[22] and decline to conclude that the circuit court abused its discretion in determining that the toxicology report was inadmissible during the pre-trial hearing.

Mr. Hundley also mounts a challenge to the circuit court's determination that text messages purportedly showing Mr. Cekada's drug transactions were not relevant, and therefore were inadmissible.  During the pre-trial hearing, the State moved to preclude Mr. Hundley from introducing the text messages.  Mr. Hundley did not object to the State's

---

[20] *Id.  See also State v. Plew*, 745 P.2d 102 (Ariz. 1987) ("The defendant claims self-defense—alleging he was trying to protect himself from the attack of an angry, intoxicated "pusher" acting under a cocaine-induced frenzy. One hopes that the behavioral characteristics of such people are not within the experience of the average juror.").

[21] *Dixon v. Stewart*, 658 P.2d 591, 598 (Utah 1982).

[22] W. Va. R. Evid. 401, *supra* n. 10.

motion insofar as the parties agreed that Mr. Hundley could present evidence that Mr. Cekada had used drugs with Andrew Piper, and that Mr. Hundley had, as a result of Mr. Cekada's drug use, confronted Mr. Cekada and kicked him out of the Piper residence. During trial Mr. Hundley had the opportunity to present this evidence. But, during Mr. Hundley's cross examination of the State's forensic investigator, David Boober, Mr. Hundley attempted to ask Mr. Boober about text messages on Mr. Cekada's phone. The State lodged an objection, and the court determined that the fact of whether or not Mr. Cekada engaged in drug transactions, as purportedly demonstrated in the text message evidence, would not make it any more likely or less likely that he brandished the firearm at Mr. Hundley before Mr. Hundley stabbed him.

The court's relevancy determination as to the text message evidence is similarly supported by the standard for relevance established in Rule 401 and the jurisprudence in other jurisdictions that the effects of illicit drugs are, generally, not "within the experience of the average juror."[23] Again, Mr. Hundley failed to demonstrate the relevance of Mr. Cekada's use of drugs and its connection to the events of the day of the incident: how Mr. Cekada's drug use, in and of itself, made a fact of consequence to the trial more or less probable.[24] Critically, Mr. Hundley was not even able to show Mr. Cekada

---

[23] *State v. Plew*, 745 P.2d 102, 106 (Ariz. 1987).

[24] *See* W. Va. R. Evid. 401.

19

used drugs on the day of the incident. So, the circuit court neither erred nor abused its discretion when it prohibited the admission of evidence related to Mr. Cekada's drug use.[25]

## B. Closing Arguments

Mr. Hundley next asserts that the circuit court erred in allowing the State to present an argument for the first time in its rebuttal in closing argument. In other words, Mr. Hundley challenges the circuit court's control of closing arguments because, according to Mr. Hundley, the State should have been precluded from presenting an argument during its rebuttal (that Mr. Cekada could not have brandished his firearm at Mr. Hundley during the altercation on Mountain Mission Road because the gun was not bloody, but his hands were) that exceeded the scope of its initial closing argument.

Citing *United States v. Smith*,[26] a decision of the United States Court of Appeals for the Fourth Circuit, Mr. Hundley asserts that Rule 29.1 of the West Virginia Rules of Criminal Procedure precludes the prosecution from putting forth new arguments in its rebuttal. Rule 29.1 states that: "[a]fter the closing of evidence and the instructions of the court to the jury, the prosecution shall open the argument. The defense shall be

---

[25] To the extent that Mr. Hundley argues that the circuit court erred in its determination that the text message evidence was not admissible because it allegedly showed that Mr. Cekada engaged in the *sale* of drugs, we similarly find that Mr. Hundley failed to identify a connection between the fact that Mr. Cekada sold drugs and any fact of consequence in determining the action.

[26] 962 F.3d 755 (4th Cir. 2020).

permitted to reply. The prosecution shall then be permitted to reply in rebuttal."[27] In *Smith*, the Fourth Circuit interpreted Rule 29.1's federal counterpart to conclude that the trial court abused its discretion when it allowed the prosecution to waive initial closing argument but retain rebuttal closing. In reaching this conclusion, the court recognized that "a prosecutor cannot use rebuttal to put forth new arguments but is restricted to responding to the points made by the defense counsel in closing argument."[28] Thus, "[t]o permit the prosecution to waive its initial closing, yet retain the opportunity to rebut, upsets the fundamental structuring of [Rule 29.1]."[29]

The State responds that the rebuttal closing argument was proper in that it was responsive to Mr. Hundley's closing argument asserting self-defense. We agree. The facts in this case, unlike the facts in *Smith*, do not indicate that the State intentionally forewent presenting a closing argument entirely in order to preclude Mr. Hundley from responding fully to its theory of the case. Nor did the State, as Mr. Hundley insinuates, save a key issue for its rebuttal in a manner that similarly precluded Mr. Hundley from responding to the State's arguments.

---

[27] W. Va. R. Crim. P. 29.1.

[28] *United States v. Smith*, 962 F.3d 755, 771 (4th Cir. 2020) (quoting *United States v. Taylor*, 728 F.2d 930, 937 (7th Cir. 1984)).

[29] *Id.*

21

Critically, although the State expressed its intent to use the photographs to argue a lack of self-defense before closing arguments, Mr. Hundley did not object to the court's ruling at that time. And the State was not then foreclosed from presenting that argument in its rebuttal under Rule 29.1 simply because it did not discuss the photographs in its initial closing argument. As the Fourth Circuit noted in *Smith*, the prosecution "is restricted to *responding to the points made by the defense counsel* in closing argument."[30] This Court has similarly recognized that "[a] proper closing argument in a criminal case involves . . . responses to the opposing party's argument[.]"[31] Here, Mr. Hundley asserted self-defense in his closing argument and the State's rebuttal referencing the photographs directly responded to his argument.

This Court has held that "a trial court has broad discretion in controlling argument before the jury and that counsel should be afforded wide latitude in presenting a case."[32] Under the facts of this case, we are not persuaded that the circuit court went beyond the broad discretion afforded to it surrounding closing arguments. Mr. Hundley presented a self-defense claim during his closing argument that the State then directly refuted during its rebuttal by presenting argument, previously permitted by the court and not objected to at that time by Mr. Hundley, illustrating that Mr. Cekada was not the

---

[30] *Id*. (emphasis added.)

[31] *State v. Guthrie*, 194 W. Va. 657, 688 n.27, 461 S.E.2d 163, 194 n.27.

[32] *Dawson v. Casey,* 178 W. Va. 717, 721, 364 S.E.2d 43, 47 (1987).

22

aggressor. So, we conclude that the circuit court did not abuse its discretion when it allowed the State to raise issues related to the photographs of Mr. Hundley's hands during its rebuttal.

## C. Arrest of Timothy Williamson

Mr. Hundley's third assignment of error is that the State committed prosecutorial misconduct and denied him due process of law when, he contends, defense witness Timothy Williamson was arrested on the first day of trial in front of the jury. As explained above, the State filed a misdemeanor information charging Mr. Williamson with false swearing after the pre-trial *McGinnis* hearing. In his brief to this Court, Mr. Hundley claims that "[t]he State had law enforcement execute the warrant [against Mr. Williamson] on the information during the first day of trial in the presence of the jury and other witnesses." He further claims that "[w]hile the jury may have been unaware of specifically Mr. Williamson's relationship to Mr. Hundley, the jury was aware that Mr. Williamson was a party associated with Mr. Hundley." So "[a]rresting Mr. Williamson in open court in front of the jury unduly prejudiced the jury against Mr. Hundley."

The State responds that this claim is not supported by the record. We agree. In his supplemental appendix, Mr. Hundley provides the case docket entries for the misdemeanor false swearing case against Mr. Williamson. And while the docket indicates that the warrant against Mr. Williamson was "[s]erved by C. Hockman in court on 5/18/22[,]" the first day of Mr. Hundley's trial, nothing in the remainder of the appendix

23

supports Mr. Hundley's claims that the State directed the arrest, that members of the jury witnessed the arrest, or that members of the jury were aware that Mr. Williamson was associated with Mr. Hundley.

We have consistently held that "[t]his Court will not consider an error which is not preserved in the record nor apparent on the face of the record."[33]  On this record, it is equally plausible that the warrant on Mr. Williamson was executed without any direction from the State and outside of the presence of the jury.  Because our review is limited to the record before us, a record lacking sufficient factual support for Mr. Hundley's claims, we decline to review the error on appeal.[34]

## D.    Exculpatory Evidence

Mr. Hundley next asserts that the State violated his due process rights by withholding exculpatory evidence related to the witness Rosanna Piper.[35]  Specifically, Mr. Hundley maintains that the State failed to disclose that Ms. Piper was working as a

---

[33] Syl. Pt. 6, *State v. Byers,* 159 W. Va. 596, 224 S.E.2d 726 (1976).

[34] *See State v. Honaker*, 193 W. Va. 51, 56 n.4, 454 S.E.2d 96, 101 n.4 (1994) ("We serve notice on counsel that in future appeals, we will take as nonexisting all facts that do not appear in the designated record and will ignore those issues where the missing record is needed to give factual support to the claim.").

[35] Mr. Hundley also reiterates his challenge to the circuit court's decision to preclude him from introducing Mr. Cekada's text messages in this assignment of error.  Because we addressed that issue above and determined that the circuit court properly exercised its discretion in so doing, we decline to address the issue again here.

confidential informant for the State at the time of Mr. Cekada's death, that she had a criminal history related to possession and distribution of controlled substances, and that she was under arrest for drug-related offenses at the time that she testified.

This Court has held that the State's withholding of evidence violates *Brady v. Maryland*[36] under the following circumstances: "(1) the evidence at issue must be favorable to the defendant as exculpatory or impeachment evidence; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must have been material, i.e., it must have prejudiced the defense at trial."[37] According to Mr. Hundley, he was prejudiced by the State's alleged withholding of evidence related to Ms. Piper because he could have used the evidence to impeach her testimony that Mr. Hundley had threatened to kill Mr. Cekada during the phone call before the altercation on Mountain Mission Road. He further maintains that he could have used the evidence to impeach her testimony that Mr. Cekada never sold drugs to Andrew Piper. Mr. Hundley argues that this testimony undermined his theory of the case that Mr. Cekada was the aggressor because "he was angry with [Mr. Hundley] because [Mr. Cekada] was kicked out of the Piper residence for selling drugs."

Critically, Mr. Hundley's own testimony confirmed that he had placed a phone call to Ms. Piper and threatened to kill Mr. Cekada after the altercation at Dollar

---

[36] 373 U.S. 83 (1963).

[37] Syl. Pt. 2, in part, *Youngblood*, 221 W. Va. at 20, 650 S.E.2d at 119.

25

General. And regardless of whether Mr. Cekada *sold* drugs to Andrew Piper, Ms. Piper did not dispute that Mr. Hundley had kicked Mr. Cekada out of the Piper residence due to his drug use. So, Mr. Hundley has failed to indicate how he was prejudiced by the State's purported failure to disclose evidence related to Ms. Piper.

More importantly, we agree with the State that Mr. Hundley cites no portion of the record to support his claims that Ms. Piper had a criminal history and/or was working as an informant for the State. As explained above, "[t]his Court will not consider an error which is not preserved in the record nor apparent on the face of the record."[38] Because the record does not support Mr. Hundley's assertions that Ms. Piper was acting as a confidential informant or had an arrest record related to her drug use, we decline to address Mr. Hundley's *Brady* claims on appeal.[39]

### E. Mr. Hundley's Statements to Law Enforcement

We now turn to Mr. Hundley's challenge to the circuit court's determination that certain statements made to law enforcement officers during in-custody interrogation were admissible. Mr. Hundley asserts that, although he subsequently executed a waiver of his rights after receiving his *Miranda* warning, the statements were nevertheless

---

[38] Syl. Pt. 6, *Byers,* 159 W. Va. at 596, 224 S.E.2d at 726.

[39] We acknowledge that Mr. Hundley may be permitted to assert this issue during a habeas corpus proceeding where a court would have the benefit of an evidentiary hearing.

inadmissible because he had previously invoked his right to counsel when Mr. Hundley stated the following: "Before I give any statements to the police, I think I may need a lawyer." Questioning ceased before the officers placed Mr. Hundley under arrest and brought him to the sheriff's department, where he was advised of his *Miranda* rights, signed a waiver, and gave a statement. At the pre-trial hearing, the court determined that the statement mentioning a lawyer was equivocal based on the inflection of Mr. Hundley's voice in the recording, and did not qualify as a request for counsel. The court further noted that Mr. Hundley was not in custody for purposes of *Miranda* at the time that he made the statement based on his demeanor and the timing of the interaction.

We agree with the State that the issue is moot because the statement was not introduced at trial. This Court recently considered similar facts in *State v. Kennedy*.[40] In that case, Mr. Kennedy claimed that he was coerced into giving a statement to police.[41] The circuit court determined that the statement was not coerced and was, therefore, admissible. Mr. Kennedy challenged that ruling on appeal. This Court concluded that because the State did not introduce the statement at trial, "the question of whether the circuit court erred in denying [Mr. Kennedy's] motion to suppress this statement [was] moot and [would] not be addressed in the appeal."[42] Similarly, we conclude that the

---

[40] No. 19-0499, 2020 WL 4360071 (W. Va. Supreme Court, July 30, 2020) (memorandum decision).

[41] *Id*. at 2, n.4.

[42] *Id*.

27

question of whether the circuit court properly determined that Mr. Hundley's statement was admissible is mooted by the fact that the State never actually introduced the statement during the trial. So, we need not address the court's determination on appeal.

## F.     Statements Regarding Mr. Hundley's Self-Defense Claim

Mr. Hundley also challenges the circuit court's determination that his statements to police were inadmissible to rebut evidence offered by the State that he allegedly concocted his self-defense claim with Ms. Piper. The State responds that "[w]hile it is true that the circuit court did not permit [Mr. Hundley] to introduce the entire statement he provided to law enforcement, the circuit court permitted [Mr. Hundley] to inquire of the officer whether [Mr. Hundley's] statements upon being arrested and interrogated were consistent with his self-defense claim." After the recorded phone call between Mr. Hundley and Ms. Piper was played for the jury, Mr. Hundley argued that he should be permitted to introduce his prior statement to law enforcement officers that he had stabbed Mr. Cekada out of fear for his safety. The court determined that Mr. Hundley could ask Officer Holz whether Ms. Piper's assertion that the stabbing was self-defense was consistent with Mr. Hundley's earlier statements, but that the statement in and of itself could not be introduced unless Mr. Hundley took the stand to testify.

This Court has previously held that a criminal defendant "ordinarily cannot introduce his own extrajudicial exculpatory statements. They are generally thought to be

28

too self-serving."[43]  Mr. Hundley identifies several extra-jurisdictional cases identifying exceptions to this standard and broadly asserts that "principles of fundamental fairness and due process" required admission of the previous statement, itself, because "the jury was likely confused as there was no context as to what parts of the statement were consistent."

We are not persuaded by Mr. Hundley's contentions.  Under West Virginia Rule of Evidence 802, "[h]earsay is not admissible except as provided by [the rules of evidence]."[44]  Subsection (c) of Rule 801 defines hearsay as a statement that "the declarant does not make while testifying at the current trial or hearing" and that "a party offers in evidence to prove the truth of the matter asserted in the statement."[45]  Subsection (d) of that Rule, in relevant part, establishes as non-hearsay "[a] declarant-witness's prior statement" that "is consistent with the declarant's testimony and is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying."[46]  But in order for the statement to be admissible, the declarant must testify and be subject to cross-examination.[47]

---

[43] *State v. Frazier*, 162 W. Va. 602, 614, 252 S.E.2d 39, 46 (1979).

[44] W. Va. R. Evid. 802.

[45] W. Va. R. Evid. 801(c).

[46] W. Va. R. Evid. 801(d)(1)(B).

[47] W. Va. R. Evid. 801(d)(1).

Here, although the circuit court determined that Mr. Hundley should be permitted to ask Officer Holz if the statements about self-defense made during the recording were "consistent" with prior statements to police, the court further determined that the earlier statement, in and of itself, was not admissible unless Mr. Hundley testified. Critically, at that point in the trial, Mr. Hundley had not decided whether he was going to take the stand. So, because it was not clear whether Mr. Hundley was going to testify and be subject to cross examination, the circuit court correctly determined that the statement was inadmissible.[48]

## G. Cumulative Error

Having addressed the remainder of Mr. Hundley's assignments of error, we now turn to his assertion that he is entitled to relief based upon the cumulative effect of numerous errors. Under the cumulative error doctrine, "[w]here the record of a criminal trial shows that the cumulative effect of numerous errors committed during the trial

---

[48] We further note this Court's holding that "[u]nder West Virginia Rules of Evidence 801(d)(1)(B) a prior consistent out-of-court statement of a witness who testifies and can be cross-examined about the statement, in order to be treated as non-hearsay under the provisions of the Rule, must have been made before the alleged fabrication, influence, or motive came into being." Syl. Pt. 6, *State v. Quinn*, 200 W. Va. 432, 490 S.E.2d 34 (1997). Because Mr. Hundley's statement was made after he was taken into custody by law enforcement officers, the motive for fabrication was, in effect, planted. But because neither party raises this issue, we decline to consider the merits of *State v. Quinn's* limitations on Rule 801(d)(1)(B). Furthermore, although Mr. Hundley testified at trial, he did not raise this issue to allow his prior statement during or after his testimony, during which he was subject to cross-examination.

prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing alone would be harmless error."[49]  Because Mr. Hundley has failed to raise a single meritorious error on appeal, he is not entitled to relief under that doctrine.

## IV.    CONCLUSION

For the reasons discussed above, we affirm the November 11, 2022 order of the Circuit Court of Jefferson County.

Affirmed.

---

[49] Syl. Pt. 5, *State v. Smith*, 156 W. Va. 385, 193 S.E.2d 550 (1972).